# RECORD NO. 25-3032
## [ORAL ARGUMENT HAS NOT BEEN SCHEDULED]

*In The*

# United States Court Of Appeals
## For The D.C. Circuit

### UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

### RUBEN OSEGUERA-GONZALEZ,

*Defendant-Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————

### BRIEF OF APPELLANT

———————

**Devin Burstein
WARREN & BURSTEIN
(619) 234-8467
501 W. Broadway, Ste. 240
San Diego, CA 92101
db@wabulaw.com**

*Counsel for Appellant*

# TABLE OF CONTENTS

Table of Authorities ................................................................ iii

INTRODUCTION ..................................................................... 1

JURISDICTIONAL STATEMENT .......................................... 3

STATUTORY AND REGULATORY PROVISIONS .................. 3

ISSUES FOR REVIEW ................................................................ 3

STATEMENT OF THE CASE ...................................................... 4

I.   Background ........................................................................ 4
II.  District court proceedings .............................................. 5
     A.   Pretrial ..................................................................... 5
     B.   Trial and sentencing ................................................ 6

SUMMARY OF ARGUMENT .................................................... 10

ARGUMENT ............................................................................... 12

I.   Agent Novick's improper lay testimony ........................ 12
     A.   Relevant precedent ................................................. 13
     B.   Agent Novick's testimony was improper ................ 18
     C.   Agent Novick's testimony was prejudicial ............. 22
II.  The government violated *Napue* .................................. 24
     A.   Relevant precedent ................................................. 25
     B.   The government knew Gomez-Ancira's testimony was made
          up ............................................................................ 26
          1.   Gomez-Ancira's fabricated testimony .............. 26
          2.   The knowingly false testimony was material ..... 38
III. Rule 403 violations ........................................................ 40
     A.   The irrelevant and unduly prejudicial helicopter evidence
          .................................................................................. 41
     B.   The unreliable and unfair graphic murder evidence ........... 51

C.    The improper evidence of fentanyl production and trafficking ......................................................................... 55

IV.   The flawed instruction on "other crimes" evidence ....................... 62

V.    Sentencing error .......................................................................... 68

    A.    Relevant facts ..................................................................... 69

    B.    The statement of facts was inadmissible at sentencing under Rules 410(a)(4) and 1101(c) ................................................74

        1.    At sentencing, the Federal Rules of Evidence governing privilege remain applicable .......................................... 74

        2.    Rule 410(a)(4) is a rule on privilege............................ 76

        3.    To the extent the government argues for plain-error review, the claim is without merit ............................... 79

        4.    Oseguera-Gonzalez's signature cannot validate the statement of facts because it was never properly translated ..................................................................... 81

        5.    The government cannot establish harmless error ...... 86

VI.   Argument for preservation ............................................................ 88

CERTIFICATION OF COMPLIANCE.................................................... 89

# TABLE OF AUTHORITIES

**Federal Cases**                                                    **Page(s)**

*Ali Hamza Ahmad Suliman Al Bahlul v. United States*,
    767 F.3d 1 (D.C. Cir. 2014) ................................................. 80

*Bishopp v. District of Columbia*,
    788 F.2d 781 (D.C. Cir. 1986) ......................................... 37

*Carter v. District of Columbia*,
    795 F.2d 116 (D.C. Cir. 1986) ............................... 41, 61, 62

*Dennis v. United States*,
    339 U.S. 162 (1950) ......................................................... 2

*Doe v. Busby*,
    661 F.3d 1001 (9th Cir. 2011) ...................................... 65, 66

*Glossip v. Oklahoma*,
    604 U.S. 226 (2025) ..................................................... 26, 39

*Handy v. Shaw, Bransford, Veilleux & Roth*,
    325 F.3d 346 (D.C. Cir. 2003) ......................................... 68

*Hernandez v. Muniz*,
    2019 U.S. Dist. LEXIS 71169 (N.D. Cal. 2019) ................................ 51

*Kyles v. Whitley*,
    514 U.S. 419 (1995) ......................................................... 53

*Martinez v. United States*,
    578 U.S. 189 (2016) ......................................................... 87

*Mawson v. United States*,
    463 F.2d 29 (1st Cir. 1972) ................................................. 88

*McNabb v. United States*,
    318 U.S. 332 (1943) ......................................................... 1

*Michigan v. Tucker*,
    417 U.S. 433 (1974) ......................................................... 76

*Miller v. Alabama*,
567 U.S. 460 (2012) ............................................................ 10

*Missouri v. Frye*,
566 U.S. 134 (2012) ............................................................ 78

*Mitchell v. United States*,
526 U.S. 314, (1999) ........................................................... 76

*Mosley v. AG Pa.*,
2022 U.S. App. LEXIS 732 ............................................... 66

*Napue v. Illinois*,
360 U.S. 264 (1959) ..............................................3, 24, 25, 40

*Old Chief v. United States*,
519 U.S. 172 (1997) ...............................................41, 47, 49, 50

*Poventud v. City of New York*,
750 F.3d 121 (2d Cir. 2014) .............................................. 62

*Robinson v. Cheney*,
876 F.2d 152 (D.C. Cir. 1989) .......................................... 22

*United States v. Ausby*,
916 F.3d 1089 (D.C. Cir. 2019) ................................... 25, 26

*United States v. Bailey*,
840 F.3d 99 (3d Cir. 2016) ................................................ 41

*United States v. Bailon-Santana*,
429 F.3d 1258 (9th Cir. 2005) .................................... 82, 86

*United States v. Brown*,
508 F.3d 1066 (D.C. Cir. 2007) ........................................ 68

*United States v. Brown*,
597 F.3d 399 (D.C. 2010) .................................................. 40

*United States v. Cunningham*,
694 F.3d 372 (3d Cir. 2012) ............................................. 41

*United States v. Davis*,
617 F.2d 677 (D.C. Cir. 1979) .................................... 77, 78

*United States v. Estrada,*
    904 F.3d 854 (9th Cir. 2018) ...................................................... 22-23

*United States v. Foskey,*
    636 F.2d 517 (D.C. Cir. 1980) ........................................................ 48

*United States v. Freeman,*
    730 F.3d 590 (6th Cir. 2013) ........................................... 17, 20, 21, 23

*United States v. Garza*
    608 F.2d 659 (5th Cir. 1979) ......................................................... 64

*United States v. Gewin,*
    471 F.3d 197 (D.C. Cir. 2006) ...................................................... 68

*United States v. Glover,*
    872 F.3d 625 (D.C. Cir. 2017) ................................................. 13, 17

*United States v. Grinage,*
    390 F.3d 746 (2d Cir. 2004) ...................................................... 18, 19

*United States v. Gutman,*
    725 F.2d 417 (7th Cir. 1984) ......................................................... 61

*United States v. Hampton,*
    718 F.3d 978 (D.C. Cir. 2013) ............................................. 13, 14, 21

*United States v. Hawkins,*
    480 F.2d 1151 (D.C. Cir. 1973) ..................................................... 54

*United States v. Head,*
    817 F.3d 354 (D.C. Cir. 2016) ....................................................... 81

*United States v. Hernandez-Rodriguez,*
    352 F.3d 1325 (10th Cir. 2003) ..................................................... 80

*United States v. Hitt,*
    981 F.2d 422 (9th Cir. 1992) .................................................... 44, 46

*United States v. Ivery,*
    2017 U.S. Dist. LEXIS 26063*16-17 (S.D. W.Va. 2017) (S.D. W.Va.
    2017) ................................................................................................. 55

*United States v. James,*
    555 F.2d 992 (D.C. Cir. 1977) .......................................................... 48

*United States v. Lentz,*
    384 F. Supp. 2d 934 (E.D. Va. 2005) ................................................ 54

*United States v. Leyva,*
    916 F.3d 14 (2019) .............................................................................. 69

*United States v. McGill,*
    815 F.3d 846 (D.C. Cir. 2016) .......................................................... 66

*United States v. Miller,*
    738 F.3d 361 (D.C. Cir. 2013) .......................................... 13, 15, 16, 22

*United States v. Moore,*
    651 F.3d 30 (D.C. Cir. 2011) .............................................................. 3

*United States v. O'Keefe,*
    128 F.3d 885 (5th Cir. 1997) ............................................................ 26

*United States v. Parks,*
    995 F.3d 241 (D.C. Cir. 2021) .......................................................... 87

*United States v. Peoples,*
    250 F.3d 630 (8th Cir. 2001) ............................................................ 17

*United States v. Reyes Vera,*
    770 F.3d 1232 (9th Cir. 2014) .......................................................... 17

*United States v. Robinson,*
    68 F.4th 1340 (D.C. Cir. 2023) ........................................................ 25

*United States v. Rogers,*
    587 F.3d 816 (7th Cir. 2009) ............................................................ 61

*United States v. Roy,*
    88 F.4th 525 (4th Cir. 2023) ............................................................ 56

*United States v. Russell,*
    221 F.3d 615 (4th Cir. 2000) ............................................................ 62

*United States v. Simpson,*
    430 F.3d 1177 (D.C. Cir. 2005) .................................................. 24, 86

*United States v. Sota,*
   948 F.3d 356 (D.C. Cir. 2020) ........................................................ 88

*United States v. Straker,*
   800 F.3d 570 (D.C. Cir. 2015) ........................................................ 38

*United States v. Thorpe,*
   --- F.4th ---, No. 23-3027 (D.C. Cir. 2025) ...................................... 80

*United States v. Williams,*
   827 F.3d 1134 (D.C. Cir. 2016) ...................................... 13, 17, 19, 20

**State Cases**

*People v. Fritz,*
   153 Cal. App. 4th 949 (2007) ........................................................ 65

*People v. Williams,*
   170 Cal. App. 4th 587 (2009) ........................................................ 51

**Federal Statutes**

18 U.S.C. § 924(c) ...................................................................... 5, 42, 88

18 U.S.C. § 3231 ................................................................................. 3

21 U.S.C. § 959(a) ........................................................................ 5, 42

21 U.S.C. § 960 ............................................................................. 5, 42

21 U.S.C. § 963 ............................................................................. 5, 42

28 U.S.C. § 1291 ................................................................................ 3

28 U.S.C. § 1827(b)(2) ................................................................. 82, 84

28 U.S.C. § 2072(a) ........................................................................... 79

28 U.S.C. § 2106 .............................................................................. 88

**Federal Rules**

Fed. R. Crim. P. 11 ............................................................ 70, 74, 77, 79

Fed. R. Crim. P. 23 ........................................................................... 82

Fed. R. Evid. 401 ................................................................... 43, 48, 59

Fed. R. Evid. 403 ...................................3, 6, 11, 40, 41, 46, 47, 48, 49, 60

Fed. R. Evid. 410 .............. 6, 12, 68, 70, 71, 74, 75, 76, 77, 78, 79, 80, 81

Fed. R. Evid. 501 ...................................................... 79

Fed. R. Evid. 595-96 ................................................ 17

Fed. R. Evid. 598 ...................................................... 18

Fed. R. Evid. 604 ................................................ 84, 85

Fed. R. Evid. 701 .................................. 13, 14, 15, 17, 18

Fed. R. Evid. 702 ...................................................... 14

Fed. R. Evid. 1101 ..............................12, 68, 74, 75, 86

## United States Sentencing Guidelines

U.S.S.G. § 2D1.1(c)(1) ............................................. 71

U.S.S.G. § 2D1.1(b)(2) ............................................. 71

U.S.S.G. § 2D1.1(b)(4) ............................................. 71

U.S.S.G. § 2D1.1(b)(5) ........................................ 71, 86

U.S.S.G. § 2D1.1(b)(11) ...................................... 71, 72

U.S.S.G. § 2D1.1(b)(12) ...................................... 71, 73

U.S.S.G. § 2D1.1(b)(16)(E) ................................. 71, 73

U.S.S.G. § 3A1.3 .................................................. 72, 73

U.S.S.G. § 3B1.1(a) ................................................... 72

U.S.S.G. Chapter 5 n. 2 ........................................... 72

No. 25-3032

UNITED STATES OF AMERICA,

      Appellee,

v.

RUBEN OSEGUERA-GONZALEZ,

      Appellant.

## APPELLANT'S OPENING BRIEF

## <u>INTRODUCTION</u>

In 1943, the Supreme Court observed, "[t]he history of liberty has largely been the history of observance of procedural safeguards.  And the effective administration of criminal justice hardly requires disregard of fair procedures imposed by law."  *McNabb v. United States*, 318 U.S. 332, 347 (1943).  Over 80 years later, this warning remains essential.  Here, it went unheeded.

By virtue of his notorious family, securing a truly fair trial for

Ruben Oseguera-Gonzalez was always going to be difficult. The sensationalism inherent in prosecuting the so-called "narco prince of Jalisco" – the son of an infamous Mexican cartel leader – could easily turn the presumption of innocence on its head. JA677-78, 1928, 1980. For that reason, the district court was obligated to ensure strict compliance with procedural protections, and to stand guard against fantastical stories of cartel exploits that would easily overshadow the relevant evidence. *See Dennis v. United States*, 339 U.S. 162, 168 (1950) ("the trial court must be zealous to protect the rights of an accused.").[1]

But instead of keeping watch, the guard threw open the gates. The court allowed the government to spend more than half the trial on largely irrelevant tales of shooting down a military helicopter, pictures of expensive watches, and stories of 10,000-person parties. All this and yet, in a case about drug importation into the United States, there was not a scintilla of evidence about any drug seizures linked to Oseguera-Gonzalez.

In the end, Oseguera-Gonzalez's "right to a fair trial[,] a

---

[1]  Unless noted, within quotations, all emphasis is added, and internal citations and punctuation marks are omitted.

fundamental liberty secured by the due process guarantee," fell by the wayside. *United States v. Moore*, 651 F.3d 30, 44 (D.C. Cir. 2011). This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. Oseguera-Gonzalez filed a timely notice of appeal. JA2420. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATUTORY AND REGULATORY PROVISIONS

Pertinent statutes and regulations appear in the addendum.

## ISSUES FOR REVIEW

1.     Whether the district court erred in allowing the case agent to give improper lay testimony that often crossed into unnoticed expert territory and usurped the jury's role.

2.     Whether the government violated *Napue v. Illinois*, 360 U.S. 264 (1959), by failing to correct the fabricated testimony of one of its key witnesses.

3.     Whether the district court erred in failing to exercise its gatekeeping function under Rule of Evidence 403 by improperly admitting irrelevant and unduly inflammatory and prejudicial evidence

of Oseguera-Gonzalez's alleged other crimes.

4.   Whether the district court erred in giving an improper, confusing instruction on other-act evidence.

5.   Whether the district court erred during sentencing by relying on a government-drafted factual summary in a draft plea agreement that, as a matter of law, could not be used against Oseguera-Gonzalez.

STATEMENT OF THE CASE

I.
Background.

The United States has long sought to extradite Nemesio Oseguera-Cervantes, alias Mencho.  JA11, 302, 977.  He is the alleged leader of a Mexican-based drug trafficking organization known as the New Generation Jalisco Cartel, or by the Spanish acronym CJNG.  JA11, 302, 363, 511.  According to the government, CJNG manufactures and distributes controlled substances into the United States.  JA363.  There is a $15 million reward for information leading to Mencho's capture.[2]

Despite the financial incentives, years of effort, and the resources dedicated to his capture, Mencho has always been one step ahead.  *See*

---

[2] *See* https://www.state.gov/nemesio-ruben-oseguera-cervantes-el-mencho-2 (Dec. 4, 2024).

*id.* So, the government took what it could get: his son. In 2015, when he was just 25, Mexican police arrested Oseguera-Gonzalez. JA175. He has been in jail ever since. JA265, 2426. In 2020, the United States extradited him. JA511.

## II.
### District court proceedings.

A. <u>Pretrial</u>.

The government charged Oseguera-Gonzalez with: Count 1 – conspiracy to distribute five kilograms or more of cocaine and 500 grams or more of methamphetamine, knowing and intending that it would be imported into the United States in violation of 21 U.S.C. §§ 959(a), 960, and 963; Count 2 – using, carrying, and brandishing firearms, including destructive devices, during and in relation to a drug trafficking crime and possessing firearms, including destructive devices, in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(l)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(B)(ii). JA5-8.

Before trial, the parties litigated numerous evidentiary issues. JA171-564. The government sought to introduce a draft plea agreement that was signed but never entered. JA264, 291-99 510-29. It also asked to introduce extensive other-act evidence about CJNG allegedly shooting

down a Mexican military helicopter, violence, and trafficking in uncharged substances, i.e., fentanyl. JA171-76. The defense filed written objections, arguing the evidence was inadmissible for a variety of reasons, including under Federal Rule of Evidence 403. JA199-231, 308-17, 391-94. The court overruled nearly every objection, except it excluded the draft plea agreement under Rule 410. JA515-29.

B.  Trial and sentencing.

During trial, the government's witnesses fell into three, sometimes overlapping categories: (1) cooperators who allegedly participated in drug trafficking activities with Mencho and to a lesser extent Oseguera-Gonzalez; (2) Mexican law enforcement discussing CJNG reportedly shooting down a military helicopter, and Oseguera-Gonzalez's later arrest near Guadalajara; and (3) United States law enforcement officers giving both lay and expert testimony about intercepted messages, firearms, and drug trafficking. JA679-87.

Beginning with the first category, the government relied extensively on a parade of cooperators seeking reduced sentences or other benefits. JA684-86, 694-95, 855-58, 1069-70, 1519-20, 1712-13.

These older, convicted narcotics traffickers consistently blurred the

distinction between their interactions with Mencho and his son. JA706-08, 711-13, 728, 734, 874-875, 963. Never mind that Oseguera Gonzalez was still a teenager during much of the timeframe of their testimony. *E.g.*, JA785 ("he would have been 14 or 15 years old at this time"), JA961 ("Menchito was too young and was not involved with any drug trafficking."). They followed Mark Twain's advice: "Never let the truth get in the way of a good story." As defense counsel objected unsuccessfully, "[e]very single question that the government has been asking conflates Mencho and [his son]." JA716.

The cooperators generally linked Oseguera-Gonzalez to his father's drug trafficking activities. JA701-02, 709, 785, 869, 963, 1717, 1725. But one, Herminio Gomez-Ancira, went much further. His testimony, discussed in detail below, bordered on delusional. He told uncorroborated stories about his seemingly magical healing powers, hiding weapons in caves, gold bars, murders, and parties. JA1160-65, 1199, 1206-07, 1261. He claimed to have moved multiple-ton loads of cocaine *by hand* from boats, over the sand, to waiting trucks. JA1078-85.

He also claimed, with no basis in reality and no corroboration, that Oseguera-Gonzalez gave the order to shoot down a Mexican military

helicopter that was pursuing his father. JA1114. Even though, based on the photographic evidence introduced by the government, his testimony could not be true and was contradicted by other government witnesses, the prosecution consistently relied on Gomez-Ancira to establish the offense elements. *E.g.*, JA1939, 1974, 2166. It then repeatedly highlighted his testimony during closing argument and sentencing. JA1919-26, 2112, 2117, 2120-23, 2313, 2332, 2336.

In addition to Gomez-Ancira, the government called a Mexican prosecutor to testify further about the helicopter incident. JA1298, 1300-41. The government also called a police officer who had been on the helicopter and survived the crash with severe burns over most of his body. JA1378-90. He told his sad – but legally irrelevant – story of pain and suffering. This was then enhanced with photo exhibits of dead bodies and high-caliber weapons. JA1305-41, 2057-81.

Although the helicopter incident was unnecessary to establish any fact of consequence, the district court allowed the government to spend half the trial on this unduly prejudicial topic.

The government also called a Mexican police officer who participated in Oseguera-Gonzalez's arrest. JA1008-09. The officer

claimed that he arrested Oseguera-Gonzalez in possession of a rifle with the words "CJNG," "Menchito," and "02" stenciled on the side.  JA1018.

Along with the cooperators and Mexican law enforcement witnesses, the government called ATF Firearms Enforcement Officer John W. Miller, who told the jury that certain weapons in evidence qualified as firearms and destructive devices under federal law.  JA1813, 1824-67.  DEA Special Agent Steve Paris testified as an expert about drug trafficking and intercepted communications.  JA1617-19, 1633-50, 1654-55, 1658-65, 1669, 1676-1703.  DEA Special Agent Kevin Novick, the case agent, testified about the investigation and intercepted communications.  JA1408-79.  The defense objected to his testimony, which repeatedly crossed into expert opinion.  JA1450, 1452, 1461-62, 1467, 1478-79.  After the court provided an incomprehensible instruction on other-crimes evidence, the jury convicted Oseguera-Gonzalez.  JA1996-97.

Then, during sentencing, the district court determined it would rely on the "facts" contained in the draft plea agreement – the same one it had previously excluded – to determine the applicable offense level and sentence.  JA2260-62, 2278-82.  On that basis, the court calculated a

guidelines range of life on count one.  JA2360.  It then imposed a life sentence on count 1 and the mandatory minimum of 30 years, consecutive, on count 2.  JA2403, 2409.  As a result, if the sentence is affirmed, Oseguera-Gonzalez will spend nearly his entire life – from age 25 until death – in prison.

That is not justice.  "Imprisoning an offender until he dies alters the remainder of his life by a forfeiture that is irrevocable." *Miller v. Alabama*, 567 U.S. 460, 474-75 (2012).  Worse still, in the context of a youthful offender like Oseguera-Gonzalez, "this lengthiest possible incarceration is an especially harsh punishment . . . because he will almost inevitably serve more years and a greater percentage of his life in prison than an [older] offender." *Id.* at 475.  This Court should reverse and remand for a new trial or, at the very least, for resentencing.

## SUMMARY OF ARGUMENT

Every defendant is entitled to a fair trial.  Here, there was none to be found.

First, the district court erred in allowing case agent Novick to provide voluminous, improper testimony interpreting intercepted communications.  He was proffered as a lay witness who would testify

based on his participation in the investigation. Instead, his testimony strayed far into expert territory and usurped the jury's function. Novick was a critical witness for the government, so his improper testimony was not harmless.

Second, the government violated Oseguera-Gonzalez's constitutional rights under *Napue* by failing to correct the fabricated testimony of cooperator Gomez-Ancira. Often, his accounts were so implausible that the prosecution had to know he was inventing them. However, rather than repudiating and correcting his testimony, as *Napue* required, the government doubled down. It leveraged Gomez-Ancira's testimony during the trial and highlighted it in closing argument. A conviction tainted by such falsity cannot stand.

Third, the district court erred in failing to exclude under Federal Rule of Evidence 403 highly inflammatory and disturbing testimony that bore little connection to any element of the charged offenses. The improperly admitted evidence took up a significant portion of the trial and undoubtedly influenced the jury's decision to convict.

Fourth, the district court erred in giving an improper instruction on other-act evidence, which required mental gymnastics to discern when

and how the evidence could be considered.  Ultimately, it allowed the jury to convict Oseguera-Gonzalez based on propensity evidence that should have never been introduced in the first place.

Finally, the district court erred by calculating the Guidelines.  It relied on a draft plea agreement that, as a matter of law, was barred by Federal Rules of Evidence 410(a)(4) and 1101(c).  Moreover, even if such a draft plea agreement could be considered – and it could not – because it was never properly translated into Spanish, and no plea colloquy was ever held, Oseguera-Gonzalez's signature could not validate the contents of the agreement.  For these reasons, the court's reliance on the agreement was a serious error.

## ARGUMENT

## I.
## Agent Novick's improper lay testimony.

The government called DEA Agent Novick to provide lay testimony about his role in the investigation.  JA1408.  The court allowed him to interpret the meaning of intercepted messages, some of which allegedly involved Oseguera-Gonzalez discussing drug transactions.  JA1428-79. This was improper for two reasons.  First, his testimony repeatedly crossed the line from permissible lay opinion to impermissible, unnoticed

expert testimony. Second, the court permitted him to usurp the jury's role by opining on topics the jurors were fully capable of determining.

Oseguera-Gonzalez preserved this claim through his repeated objections below. JA1450, 1452, 1461-62, 1465, 1467, 1478-79. Review is for abuse of discretion. *See United States v. Hampton*, 718 F.3d 978, 981 (D.C. Cir. 2013).

## A.    Relevant precedent.

This Court and its sister Circuits have a well-developed body of caselaw addressing the use of lay witnesses to interpret intercepted communications. *See, e.g.*, *Hampton*, 718 F.3d at 981-83; *United States v. Miller*, 738 F.3d 361 (D.C. Cir. 2013); *United States v. Williams*, 827 F.3d 1134 (D.C. Cir. 2016); *United States v. Glover*, 872 F.3d 625 (D.C. Cir. 2017).

In *Hampton*, for example, the question was whether "the district court violated Rule 701 of the Federal Rules of Evidence when it permitted the FBI's [] case agent to testify about his understanding of recorded conversations played for the jury." 718 F.3d at 980. The Court explained, "Federal Evidence Rule 701 permits lay testimony in the form of an opinion when it meets the following criteria: it must be rationally

based on the witness's perception and helpful to the jury in understanding the witness's testimony or the determination of a fact in issue, and may not be based on the kind of specialized knowledge possessed by experts within the scope of Rule 702." *Id.* at 981.

Critically, the Court explained: "When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701, first because there is no way for the court to assess whether it is rationally based on the witness's perceptions, and second because the opinion does not help the jury but only tells it in conclusory fashion what it should find. Enforcement of Rule 701's criteria thus ensures that the jury has the information it needs to conduct an independent assessment of lay opinion testimony." *Id.* Further, "[j]udicial scrutiny of a law-enforcement witness's purported basis for lay opinion is especially important because of the risk that the jury will defer to the officer's superior knowledge of the case and past experiences with similar crimes." *Id.* at 981-82.

To this end, "[w]hen an agent, particularly a case agent, provides interpretations of recorded conversations based on his knowledge of the entire investigation, the risk that he was testifying based upon

information not before the jury, including hearsay, or at the least, that the jury would think he had knowledge beyond what was before them, is clear." *Id.* at 982-83. For these reasons, an "agent's interpretation of conversations [is] not a permissible lay opinion under Rule 701 [when,] rather than being helpful to the jury, it usurp[s] the jury's function." *Id.* at 983.

After explaining these principles, the Court held that the case agent's testimony repeatedly crossed the line and thus vacated the conviction. "In light of the importance of Agent Bevington's opinion testimony to the government's case . . . and the likelihood that the jurors afforded Bevington substantial authority because of his expertise and access to information unavailable to them, we cannot say with fair assurance that the error did not substantially affect the jury's verdict." *Id.* at 984.

Similarly, in *Miller*, 783 F.3d at 373, the defendants "challenge[d] [] the lay opinion testimony by FBI Agents Sparks and Turner and Detective Hall[,] focus[ing] on the witnesses' interpretation of the recorded phone conversations."

During trial, the agents "offered their lay opinions regarding the

meaning and significance of certain wiretapped phone conversations. Turner testified over several days, often opining based on the overall state of the investigation, his overall knowledge of the investigation, his perceptions in this case, and other similarly general bases. He also testified about the meaning of coded language in phone conversations[.] Sparks and Detective Hall likewise interpreted the meaning of recorded phone conversations based on their knowledge of the overall investigation, or similar generalized bases, such as knowledge that [they] received in this investigation, and the wiretap in general." *Id.*

The Court held, "[a]dmission of the government agents' interpretative lay opinion testimony was plain error[.] Their interpretations of non-coded language were erroneously admitted because they did not set forth the specific bases (events, other calls, seizures of contraband, etc.) upon which their opinions rested — other than broad claims about knowledge they had gained from the investigation. This gave the jury no effective way to evaluate their opinions." *Id.*[3]

The Ninth Circuit made a related point in *United States v. Reyes*

_____

[3] The analysis in *Williams* and *Glover* is similar.

*Vera*, 770 F.3d 1232 (9th Cir. 2014). Under Rule 701, when providing "lay opinions about the meaning of intercepted phone calls," the "officer may not testify based on speculation, rely on hearsay or interpret *unambiguous, clear statements*." *Id.* at 1242.

The Sixth Circuit is in accord. "[L]ay opinion testimony is permitted under Rule 701 because it has the effect of describing something *that the jurors could not otherwise experience for themselves* by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event." *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013). Testimony on topics that the jury is fully capable of determining for itself is not "helpful to clearly understanding the witness's testimony," Fed. R. Evid. 701, and is inadmissible. *See id.* at 595-96. Thus, "a case agent testifying as a lay witness may not explain to the jury what inferences to draw from recorded conversations involving ordinary language." *Id.* at 598; *see also United States v. Peoples*, 250 F.3d 630, 640 (8th Cir. 2001) (where the agent's "testimony was not limited to coded, oblique language, but included plain English words and phrases" it was inadmissible under Rule 701).

Finally, the Second Circuit adopted a similar analysis in *United States v. Grinage*, 390 F.3d 746, 748-49 (2d Cir. 2004). There, a DEA agent testified that several intercepted phone calls using the phrases "I need something bad, bad, bad," and "I need about nearly four," were drug-related "based on [his] knowledge of the entire investigation" and "because of his knowledge of [the defendant's] activities." *Id.* at 748-49.

The court held that this testimony was improper lay opinion because it "usurped the function of the jury to decide what to infer from the content of the calls." *Id.* at 750. It warned that, if such testimony were permitted, "there would be no need for the trial jury to review personally any evidence at all. The jurors could be 'helped' by a summary witness for the Government, who could not only tell them what was in the evidence but tell them what inferences to draw from it. That is not the point of lay opinion evidence." *Id.*

## B. Agent Novick's testimony was improper.

Here, Agent Novick's testimony implicated all these concerns. He was the case agent. He testified at length as a supposed lay witness about intercepted conversations. He was not simply asked what was said, but also (and repeatedly) to interpret the messages, *e.g.*, "[w]hat is

your understanding of the[se] communications?"  JA1449, 1452, 1461, 1462-63, 1478.

In contravention of this Court's controlling precedent – and over numerous objections – the district court further allowed him to tell the jury that his interpretations and opinions were based not only on the instant investigation, but additionally on his work "in other BlackBerry Messenger [BBM] wiretap investigations" and his review of "hundreds" of such communications during his "time as an agent." JA1451.  He further testified that he reviewed "at least 100" BBM "communications from this case," far beyond what was admitted in evidence.  JA1452.  This was problematic and prejudicial.

To paraphrase this Court in *Williams*, 827 F.3d at 1162, "Agent [Novick] told the jurors not only what he thought, but his opinion of what the evidence showed and that he had substantial experience in drug conspiracy investigations and was involved in the [] investigation that resulted in [the defendant's] indictment[.]"  Thus, "there was a strong likelihood that the jurors afforded [Agent Novick] [] substantial authority because of his expertise and access to information unavailable to them allowing his lay opinion testimony to influence their decision." *Id.*

Moreover, Agent Novick's testimony usurped the jury's role by interpreting plain language. *See Freeman*, 730 F.3d at 597 ("a lay [witness] . . . may not form conclusions for a jury that they are competent to reach on their own."). As one example, the court allowed him to interpret certain BBMs to mean "[t]hat El Escorpion, Señor Robinson, and the defendant were discussing an individual who had been picked up or kidnapped, I believe named Alejandro Mercado, and trying to figure out who had him or where he was at." JA1452. This was improper because these conversations spoke for themselves. The jury could have easily drawn its own interpretation of the plain language in the BBMs.

The same problem occurred frequently. Agent Novick was permitted to interpret communications about kidnapping, trying to get an associate out of the hospital, and preparing a rifle for a Russian coming to town. JA1452, 1466. The examples abound. *E.g.*, JA-1467-68, 1478-79. These so-called "interpretations" spoon-fed the jury his conclusions based on clear, uncoded conversations. *See Freeman*, 730 F.3d at 597 (finding error when the lay witness "effectively spoon-fed his interpretations of the phone calls and the government's theory of the case to the jury, interpreting even ordinary English language.").

And when the defense continued objecting, the judge magnified the harm by instructing the jury that Agent Novick's opinions were "based on his familiarity *with the fuller context of the BBM communications* and understanding of the operations of this particular cartel." JA1467. This is precisely what the Court warned against in *Hampton*, 718 F.3d at 981-82. The district court amplified the imprimatur of Agent Novick's testimony by telling the jurors that Agent Novick had access to more information than they had, so they should trust his opinions. *See id.*

This is not to say Agent Novick should have been precluded from identifying the participants in the conversations based on his role in the investigation. But beyond that legitimate lay testimony, the rest was erroneously admitted. *See*, *e.g.*, *Freeman*, 730 F.3d at 598 ("a case agent testifying as a lay witness may not explain to the jury what inferences to draw from recorded conversations involving ordinary language.").

That is true not only because Agent Novick was interpreting non-coded language, but also because he "did not set forth the specific bases (events, other calls, seizures of contraband, etc.) upon which [his] opinions rested — other than broad claims about knowledge [he] had gained from th[is] investigation" and others. *Miller*, 738 F.3d at 373.

"This gave the jury no effective way to evaluate [his] opinions." *Id.* Thus, even if the defense had not preserved this issue by repeatedly objecting – which it did – "[a]dmission of [Agent Novick's] interpretative lay opinion testimony [would be] plain error." *Id.*

## C. Agent Novick's testimony was prejudicial.

Although the government will likely argue harmless error, Agent Novick was uniquely important to the prosecution. His significance is illustrated by comparison to the government's other witnesses

First, the cooperators. They were highly biased, morally reprehensible murderers, clearly singing for their suppers. "A witness seeking [] leniency may have an interest in cooperating with the Government, even if it means giving a false account[.]" *Robinson v. Cheney*, 876 F.2d 152, 158 (D.C. Cir. 1989). Courts have rightly "stressed repeatedly that informants as a class, although indispensable to law enforcement, are oftentimes untrustworthy." *United States v. Estrada*, 904 F.3d 854, 864 (9th Cir. 2018). At the very least, "when an informer testifies, his [] testimony should be considered with caution." Criminal Jury Instructions for the District of Columbia, Instruction 2.205.

Second, the government had its experts, but they were unaware of

the investigation and therefore could not comment on what Oseguera-Gonzalez did or did not do.  JA1624, 1630, 1823.

Third were the Mexican law enforcement officials who testified about the helicopter incident and Oseguera-Gonzalez's arrest.  But they did not participate in the investigation and never testified about whether he engaged in drug trafficking.  JA1008-44, 1298-1366.

Agent Novick was the only witness with personal knowledge of the investigation and (ostensibly) Oseguera-Gonzalez's conduct.  As the case agent, his testimony naturally carried significant weight, which demonstrates the considerable prejudice arising from its erroneous admission.  *See Freeman*, 730 F.3d at 599.

Nor was the other evidence so overwhelming as to neutralize this prejudice.  Tellingly, the government did not tie a single drug seizure in the United States to Oseguera-Gonzalez.  They could not pin even an ounce of drugs sold in this country on him.  In a case about importing narcotics into this country, that is a massive evidentiary gap.  Equally illustrative is that none of the myriad intercepted messages discussed sending drugs to the United States.  On the contrary, the only message naming a specific country talked about sending drugs to Canada.

JA1477, 1964.

On appeal, the government bears the burden of establishing harmlessness. *See United States v. Simpson*, 430 F.3d 1177, 1184 (D.C. Cir. 2005). Because it cannot do so, the introduction of Agent Novick's extensive, improper lay testimony requires reversal for retrial.

## II.
### The government violated *Napue*.

The same remedy is warranted because the government violated Oseguera-Gonzalez's constitutional rights by failing to repudiate Gomez-Ancira's false testimony, as required by *Napue v. Illinois*, 360 U.S. 264 (1959).

Gomez-Ancira was the government's most important cooperating witness. He allegedly worked for Mencho and claimed to have had direct communication with Oseguera-Gonzalez. Before trial, citing *Napue*, the defense sought to exclude this cooperator testimony. JA216. The district court overruled the objection. JA554. Review is de novo. *See United States v. Robinson*, 68 F.4th 1340, 1346 (D.C. Cir. 2023).[4]

---

[4] Given the gravity of the constitutional error, Oseguera-Gonzalez would also prevail under the abuse of discretion or plain error standards.

## A.    Relevant precedent.

Under *Napue v. Illinois* and its progeny, the prosecution's introduction of false testimony deprives a defendant of a fair trial as required by the Fifth and Sixth Amendments. "The government commits a *Napue* violation when the government introduces false or misleading testimony or allows it to go uncorrected, even though the government knew or should have known that the testimony was false." *United States v. Ausby*, 916 F.3d 1089, 1092 (D.C. Cir. 2019).

To obtain relief for a *Napue* violation, the subject evidence must be "material." *Id.* "[T]he government's introduction of false testimony is material if the evidence could . . . in any reasonable likelihood have affected the judgment of the jury. The 'reasonable likelihood' standard does not require the defendant to show that he more likely than not would have been acquitted absent the false statements." *Id.*

"Rather, the defendant need show only that the false testimony undermine[s] confidence in the verdict. Thus, even if the false testimony may not have affected the jury's verdict, it is material if the evidence reasonably could have affected the verdict. . . . [T]he 'reasonable likelihood' standard is outcome-driven—that is, the relevant question is

whether the false testimony could have altered the outcome of the case. *This standard is quite easily satisfied.*" *Id.* at 1093. As the Supreme Court recently held in *Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025), "this materiality standard requires the beneficiary of [the] constitutional error [the government] to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."

Importantly, "even when the defense is aware of the falsity of the testimony, a deprivation of due process may result when the information has been provided to the defense but the government reinforces the falsehood by capitalizing on it in its closing argument[.]" *United States v. O'Keefe*, 128 F.3d 885, 894-95 (5th Cir. 1997).

## B. The government knew Gomez-Ancira's testimony was made up.

Here, Gomez-Ancira's testimony was material, and the prosecution must have known it was fabricated.

### 1. Gomez-Ancira's fabricated testimony.

According to his account, Gomez-Ancira was the police director for Villa Purificación, a town in Jalisco, Mexico. JA1056-57. He claimed Mencho was his godfather and real boss. JA1055-56, 1060, 1211, 1251. His testimony was riddled with fantasy.

For instance, he testified that in 2015, he was tortured, had bones broken, was shot in the head, and left for dead.  JA1065-67.  Despite all this, he was able to drag himself "to a cane field nearby" and then, with no medical attention, "it was a journey of three months [walking] for me to get to the [United States] border, wandering and doing as best as I could. And then I -- it took me another three months, three months to recover because I was injured . . . . And *all I could eat was aloe pulp*." JA1067.

Gomez-Ancira claimed he then crossed into the United States illegally, JA1068, and healed himself "with the pulp of aloe vera," "powdered penicillin," and "with the leaves of the guava fruit."  JA1259. He had also been very ill from pneumonia, but "was healed with ten lemons, one pineapple, two cinnamon sticks, honey from bees, [and] a chunk of ginger root."  JA1260.

In 2020, after his miraculous fruit-based recovery and, having been previously convicted of drug crimes under a false name, deported and illegally reentering the United States for a second time, he signed up as a cooperator with the DEA.  JA1070, 1166-67.  But this was only after the FBI rejected him as a potential informant.  JA1174-75.  He told the

FBI – with no basis in reality – that he personally observed ISIS members in Mexico training CJNG. JA1174, 1223, 1226. The Bureau wanted no part of his nonsense.

But the DEA was willing to look past Gomez-Ancira's fabrications. It signed him up, gave him and his wife immigration documents allowing them to live in the United States, and paid him approximately $85,000. JA1069-70. Not surprisingly, in return, he agreed to testify against Oseguera-Gonzalez. JA1069-71.

Gomez-Ancira told the jury that, in April 2015, Oseguera-Gonzalez instructed him "to pick up five tons of [cocaine] in a fishing boat." JA1081. Over the course of a single night, he and his team of just 12 officers supposedly carried all five tons *by hand* – broken up into 20-kilogram (44-pound) packages – from the boat across a sandy beach to a trailer for transport to a warehouse. JA1081-82.

Later that same month, Oseguera-Gonzalez allegedly instructed him to do the same thing, but this time it was *20 tons* in the boat. JA1084. He again swore that he and his team (a total of 22 people) carried all 20 tons *by hand* across the beach to waiting trailers in one night. JA1084-85.

The math is telling: 20 tons is equivalent to 20,000 kilograms, which was divided into 1,000 individual packages of 20 kilograms (44 pounds) each. With 22 people, *each person* would have had to complete approximately 45.5 trips across the beach, carrying a bulky package weighing 44 lbs., and then load each package onto a trailer. Over the course of the offload, every individual would have carried approximately 2,000 pounds across the sand. While this is perhaps technically possible, the athletic prowess of these supermen is uncanny.

Gomez-Ancira then continued on about his exploits. According to him, a month later, in May 2015, "Mencho sent [him] to a hospital in Guadalajara. [He] had pneumonia [and] was very ill." JA1073. He was in his hospital bed with an infection in "50 percent" of his lungs, when he supposedly received a desperate call from Oseguera-Gonzalez and his father. JA1112-15. They said there was a military helicopter chasing them and told Gomez-Ancira to shoot it down (even though they knew he was in the hospital). JA1114. From his hospital bed, Gomez-Ancira supposedly passed along the order to shoot down the helicopter. JA1114.

However, he could not explain why Mencho and Oseguera-Gonzalez would call him when he was hours away in a Guadalajara hospital, just

to deliver an order to people who were already with them during the helicopter pursuit. It would be like calling across the country to give a message to someone sitting across the table during lunch. But such is the nature of delusion.

In any event, Gomez-Ancira continued his tale, claiming he was ordered to leave the hospital in Guadalajara and drive over three hours back to the area around Villa Purificacion to retrieve the weapons that had been discarded during the battle with the Mexican government and also to pick up the injured CJNG members. JA1115-16.

According to Gomez-Ancira, when he arrived, there were over 10,000 Mexican soldiers in the area. JA1190. Nevertheless, he was able to dodge them and collect *all* the weapons used by CJNG during the battle. JA1190. Specifically, he identified photos of weapons in the government's exhibits – weapons that the Mexican government had collected during the subsequent investigation – and claimed he found those weapons and hid them. JA1196-1202. For instance, as to "the RPG that had been used to down the helicopter," he "picked it up, and the bullet myself, and two trucks that were also in the same location." JA1196. He took all the weapons, "put them in black plastic bags and I

hid them in this little hill, in some caves among the rocks." JA1199.

Q.    You brought it to the cave?

A.    All of it together.

Q.    Okay.  And you left it there?

A.    Yes.

JA1201.

Q.    And in addition to retrieving the weapons, you also rescued all of Mencho's injured soldiers?

A.    All of them.

JA1204.

Q.    In total, how many injured soldiers were taken to your house where you live?

A.    Exactly, about 47 or 50. Wounded, only 17. Only 17 wounded.

JA1205.

Q.    Now, you also told the government, when you met with them, that, in addition to retrieving the weapons, you also retrieved a lot of gold bars that Mencho had left behind, right?

A.    In the truck that I picked up, there was all of that; money, gold, things.

Q.    Okay. So in addition to retrieving the weapons, rescuing 50 or so people, you also retrieved a truck full of gold?

A.    Not full of gold, not -- it was not full. There was some gold there.

\*\*\*

Q.  Well, were there more than 50 bars?

A.  Possibly more.

\*\*\*

Q.  Okay. And so where did you take the gold?

A.  The gold and the money, as I said before, were left in the truck[.]"

JA1206-07.

Beyond these stories, for Gomez-Ancira, no subject was free from his imaginative self-aggrandizement:

Q.  You claim that there were 1,000 people at your wedding, right?

A.  There were 1,000 people from the cartel. I didn't count them. There were 10,000 people altogether at the party, then there were people at the soccer field, and there were people in the bullpen.

JA1210-11.  According to his account, despite a party of 10,000 people at his wedding, not a single picture existed.[5]

As this recitation demonstrates, Gomez-Ancira had a loose relationship with the truth.  The falsity was confirmed by photographic evidence and the sworn testimony of Maria Hernandez, the Mexican

---

[5] He seemed to like the number 10,000; it was also the number of soldiers he claimed were in the area immediately after the helicopter crashed. JA1272.

federal prosecutor who led the investigation into the helicopter crash. JA1310-38.

She arrived not long after and spent five days investigating. JA1301, 1344, 1348-49. Directly contradicting Gomez-Ancira, her team found the weapons discarded by CJNG – identified in the government's photographic exhibits – on the ground where they had been left during the gun battle. JA1303-40, 1362. None of the weapons Gomez-Ancira claimed he collected in a black bag, including the RPG, were found in a black bag or in a cave. JA1362. They were all found near the convoy of abandoned CJNG vehicles that had been shot up during the battle. JA1310-38, 1356-58. They had not been moved or hidden. JA1349-52. Nor did she find any gold bars or money in any of the vehicles. JA1310, 1362. From her perspective, the scene appeared to have been undisturbed since the battle. JA1303, 1357-62.

In short, *regarding the same weapons in the same government exhibits,* the testimony of Gomez-Ancira and Prosecutor Hernandez could not both be true. He said he collected all the weapons, including the RPG used to shoot down the helicopter, put them in bags, and hid them in a cave. She said her team found the weapons on the ground near the CJNG

convoy, where they had been abandoned. The objective photos that the government entered into evidence fully supported her account and disproved his.

Their contradictory accounts were summarized by the defense during closing:

> So he [Mr. Gomez Ancira] told you that on the day that the helicopter was taken down he received an order by Mencho on the radio; and he said: You need to go and collect these weapons.

> Now, Mr. Gomez Ancira, according to his testimony, is four hours away in a hospital in Guadalajara, dying of pneumonia, but he has to follow his boss's orders.

> Now, critically, I think when we talk about corroboration or when we talk about inconsistencies, Jesus Contreras Arceo said: Mencho never used the radio. But Gomez Ancira said he got the call on the radio. So he then drives all the way to Villa Purificacion, which he says he made it in three and a half hours.

> And he tells you -- he wants you to believe – the government wants you to believe this, too -- that he picked up all of the weapons including government's -- specifically, Government's Exhibit 138 and Government's 159, which are the RPG that he says was specifically used, and -- I don't know how he would know that -- and the rocket that fit in there. And those two weapons, and all the other ones, he gathered them up, put them in a black bag, and then put them in a cave. He also said that he and his men moved all the

trucks around and that, in one of the trucks, he found bloody money and gold bars.

JA1940-41.

Now, we [also] heard testimony from the Mexican federal prosecutor, who -- I think you should look at her demeanor and testimony when she testified because she didn't have a stake here; and I think she told the truth. And what she told you was entirely inconsistent with the story that Hermenio Gomez Ancira told you. She told you: No, the weapons were scattered around the field in the debris area. We never found anything in a cave, or two duffle bags in a cave.

Now, she also said that the trucks were all in line in a convoy, as if they were abandoned in that line. Not moved from where they were; in a convoy.

And when Mr. Ronis asked her that question, her demeanor; did you see? Kind of, like, what? A cave?

No. Completely inconsistent with what he said.

Now, she also said that the trucks were all in line in a convoy, as if they were abandoned in that line. Not moved from where they were; in a convoy.

Did Mr. Gomez Ancira go and drive those and put them all in a line? No. It's ridiculous and inconsistent with what he testified to.

Now, the other thing is the bloody money and the gold bars. Again, when Mr. Ronis asked the Mexican federal prosecutor about it, she had this kind of a -- what? Gold bars? No. We didn't find gold

bars or money.

　　And I would say that if they were going to steal it, why wouldn't they take the watches, right? If they're going to steal the gold bars -- and I don't know what the government's explanation could be for these incredible inconsistencies between the Mexican federal prosecutor investigating the scene and what Mr. Gomez Ancira said. Somebody is lying. I would say it's Mr. Gomez Ancira.

JA1941-42.

This demonstrates why the prosecution was required to repudiate Mr. Gomez-Ancira's testimony under the principles animating *Napue*. The government simply could not have credited the testimony of both Ms. Hernandez and Gomez-Ancira. Their accounts of what happened during the helicopter's downing cannot coexist.

To be clear, this was not simply a matter of conflicting versions of the same event, which happens regularly. Witnesses will naturally have differing recollections. Memory is fallible. This was not that. It was as if two people visited the same zoo at the same time, and afterward, one described seeing purple dinosaurs and green unicorns, while the other reported pink flamingos and gray elephants. One of those people is not living in reality.

This Court has explained, "[d]ocuments or objective evidence may

contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find [] error even in a [district court] finding purportedly based on a credibility determination." *Bishopp v. District of Columbia*, 788 F.2d 781, 785 (D.C. Cir. 1986) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 512 (1985)). That is the situation here.

Mr. Gomez-Ancira's story was contradicted by objective photographic evidence, internally inconsistent, and implausible on its face. Moreover, at the time of his testimony, the prosecution was aware that he had previously lied about his identity during a sworn proceeding. JA1167. Thus, it strains credulity to suggest the government did not know he was making up stories about his seemingly magical ability to heal himself and avoid apprehension while surrounded by thousands of police and military near the crash site.

The government cannot disregard such fabrication; it was obligated to correct or withdraw his testimony because "[t]he government's use of knowingly misleading testimony that confuses the court, jury, and defense alike . . . is deeply disappointing and troubling behavior,

unbefitting those who litigate in the name of the United States." *United States v. Straker*, 800 F.3d 570, 604 (D.C. Cir. 2015).

   2.   The knowingly false testimony was material.

In addition to the knowing falsity of Gomez-Ancira's testimony, *Napue*'s materiality element is also satisfied. The prosecution focused extensively on the helicopter incident, and Gomez-Ancira was the only witness who testified to having been part of the event. He was the only one to claim he heard Oseguera-Gonzalez order the attack. The government also repeatedly relied on Gomez-Ancira's testimony in its closing:

> Herminio Gomez Ancira told you that the defendant wanted to build an empire by sending fentanyl to the United States because it was way more profitable than the cocaine that he was already sending there.
>
> ***
>
> Herminio Gomez also told you about a time when he drove a pickup truck filled with U.S. dollars, all $50 and $100 bills, and personally delivered that truck to the defendant. And the defendant himself said: That money came from selling drugs to the Blondies, the Americans.

JA1922.

   Herminio Gomez told you about going around every month to

seven labs and picking up methamphetamine that he would deliver to the defendant.

JA1923.

Herminio Gomez and his men unloaded 10,000 kilograms of cocaine from a shipping boat for the defendant, and then another 10,000 for his father.

JA1925.

This heavy reliance on Gomez-Ancira demonstrates that his credibility was key to the government's case. Accordingly, had the government acknowledged the falsity of his testimony, it would have materially impacted the jury's view of his believability and, thus, could well have impacted the verdict. *See*, *e.g.*, 9th Cir. Model Crim. Instr. 1.7 ("if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.").

Indeed, "[h]ad the prosecution corrected [the witness] on the stand, his credibility plainly would have suffered. That correction would have revealed to the jury not just that [he] was untrustworthy . . . but also that [he] was willing to lie to them under oath. Such a revelation would be significant in any case[.]" *Glossip*, 604 U.S. at 248-49. To this end, as *Napue* held, "[i]t is of no consequence that the falsehood bore upon the

witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the [prosecutor] has the responsibility and duty to correct what he knows to be false and elicit the truth[.]" *Napue*, 360 U.S. at 269-70.

That did not happen. Oseguera-Gonzalez is entitled to a new trial.

## III.
## Rule 403 violations.

A new trial is also required because the district court failed to exclude significant portions of the government's evidence under Federal Rule of Evidence 403. In his motions in limine, Oseguera-Gonzalez objected to the introduction of the evidence discussed below. JA213 ("all of the proffered evidence should [] be excluded under Rule 403, as it all is unfairly prejudicial to Oseguera-Gonzalez in that the probative value of the evidence is substantially outweighed by the prejudicial effect."). The district court overruled the objection. JA554. Accordingly, the issue is preserved. Review is for abuse of discretion. *See United States v. Brown*, 597 F.3d 399, 406 (D.C. 2010).

In evaluating evidence under Rule 403, a comparative analysis is required. That is, when "[t]he government has alternate, less prejudicial ways of presenting the [evidence,] this substantially reduce[s] the

probative value of the [contested evidence]." *United States v. Bailey*, 840 F.3d 99, 122 (3d Cir. 2016) (cleaned up); *Carter v. District of Columbia*, 795 F.2d 116, 129 (D.C. Cir. 1986) ("The judge [] failed to consider alternative methods of proof that would have avoided the danger of unfair prejudice to the defendants.").

Under Rule 403, "the law of diminishing marginal returns [] operates" such that "[t]he probative value of each [piece of evidence is] reduced by the existence of the [evidence] before it." *United States v. Cunningham*, 694 F.3d 372, 389 (3d Cir. 2012). Thus, "what counts as the Rule 403 probative value of an item of evidence . . . may be calculated by comparing evidentiary alternatives." *Old Chief v. United States*, 519 U.S. 172, 184 (1997).

## A. The irrelevant and unduly prejudicial helicopter evidence.

The Supreme Court's statement in *Old Chief* is directly relevant to the government's extensive evidence about the helicopter attack. That days-long evidence had no bearing on any element of the drug conspiracy charge and was also unnecessary to establish count two. Accordingly, the probative value was slight, but the unfair prejudice was enormous.

To review, count one charged a conspiracy to distribute cocaine and

methamphetamine knowing that the drugs would be imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960, and 936. JA1-2, 5-6. Count two charged the intentional "use, carry and brandish[ing] firearms, including destructive devices, during and in relation to one or more drug trafficking crimes, to wit: the crime charged in Count One, and did knowingly and intentionally possess firearms, including destructive devices, in furtherance of such drug trafficking crimes, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(B)(ii)." JA6-7.

The elements of count one were:

(1) From on or about the dates alleged in the charge, an agreement existed between the defendant and at least one other person to knowingly or intentionally distribute cocaine and methamphetamine knowing and intending that such substances would be unlawfully imported into the United States;

(2) The defendant knew of the unlawful purpose of the agreement. This means that the defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake, or accident; and

(3) The defendant joined in the agreement knowingly and willfully, that is, with the intent to further its unlawful purpose.

JA1999-2000, 2033-34.

For count two, the elements were:

42

(1) The defendant committed the crime of conspiracy to distribute controlled substances knowing and intending that they would be unlawfully imported into the United States, as charged in count one; and

(2) The defendant either:

(a) knowingly and intentionally used or carried firearms during and in relation to the crime charged in count one, or:

(b) knowingly and intentionally possessed firearms in furtherance of that crime.

JA2004, 2035.

Beginning with count one, there is a strong argument that the helicopter evidence did not even meet the low threshold for relevance required by Federal Rule of Evidence 401. Rule 401 defines relevant evidence as having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. But the who, what, when, where, and how of the helicopter incident did not tend to make any of the count one elements more or less likely. Indeed, there was no evidence that the alleged CJNG convoy was even transporting drugs when the incident took place.

Even assuming some tangential relevance, however, it was far outweighed by the danger of unfair prejudice. A jury would naturally

conclude that anyone with the power to order a successful attack on a military helicopter must be an incredibly dangerous criminal cartel leader. And any person like that would necessarily be guilty of a conspiracy to import drugs into the United States because that is what Mexican drug cartels do.

The government then played on that theme by needlessly bringing a plethora of high-powered weaponry into the courtroom, including a massive .50 caliber rifle that no one could lift unassisted. JA2078-80, 1336-41, 1351-53. These courtroom theatrics served only to make the jury fear Oseguera-Gonzalez, unfairly playing to the jurors' emotions. *See United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992) ("Rightly or wrongly, many people view weapons, especially guns, with fear and distrust. . . . The prejudice is even greater when the picture is not of one gun but of many.").

The upshot is this: Regardless of the actual evidence – or lack thereof – there was a considerable danger the jury would convict based on the helicopter testimony. Magnifying that danger was the entirely unfair emotional impact of the testimony from Mexican police officer Ivan Morales Corales, who was left permanently disfigured by burns he

suffered when the helicopter crashed.

The prosecution foreshadowed its ploy in opening statement: "[T]he evidence will show that his face and his body are scarred because the narco prince of the CJNG -- the defendant -- ordered his helicopter to be shot out of the sky." JA687. Thereafter, the government elicited from Mr. Morales Corales disturbing testimony designed to cause any reasonable jury to feel deep sympathy for the witness and deep antipathy for those behind the attack.

Q. Do you remember anything about the flight to the hospital in Guadalajara?

A. Yes. I was awake the entire time. In fact, I was told by my coworkers not to fall asleep because I was starting to lose consciousness, and they were not letting me fall asleep. And, yes, I do remember the flight or the trip to the military hospital in Guadalajara, where they received me immediately and they started taking my burnt clothes off.

Q. And what happened once you got to that hospital?

A. I was received or checked in immediately, and I was still aware -- I was aware that I was in bad shape. They started taking all my clothes off, and they sedated me; and then I woke up a month later.

Q. How long did you stay in the hospital?

A. I was five months in the hospital.

Q. Did you receive any surgeries?

A.     Countless surgeries. I don't remember how many.

Q.     Generally speaking, what were the surgeries for?

A.     They were skin grafting, and they were -- because my body was 70 percent burnt. My face was burned, my arms were burned, my legs were burnt. The only things that were not burned were my feet and my chest; but, yeah, they were mainly skin grafts.

Q.     Did you receive any treatment after the surgeries to help with your recovery?

A.     Yes. I had to submit myself to reconstructive surgeries and therapy for mobility.

Q.     Do you know if anyone else who was in the helicopter with you on May 1, 2015, survived?

A.     Yes. Half of the crew that were there survived.

Q.     Are you still a police officer in Mexico?

A.     No. Not anymore.

Q.     Why not?

A.     After what had happened to me, I could no longer be in that institution because the process that I still had to do to recover, I could no longer be there.

JA1388-90.

This testimony had no bearing on any legitimate trial issue. Instead, it was precisely the type of emotional appeal that Rule 403 is intended to preclude. *See Hitt*, 981 F.2d at 424 ("Where the evidence is

of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury.").

"The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of [the] evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged. So, the Committee Notes to Rule 403 explain, 'Unfair prejudice within its context means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, *an emotional one.*'" *Old Chief*, 519 U.S. at 180.

It is improper to "generaliz[e] a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged (or, worse, as calling for preventive conviction even if he should happen to be innocent momentarily). As then-Judge Breyer put it . . . the risk that a jury will convict for crimes other than those charged-- or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment--creates a prejudicial effect that outweighs ordinary relevance." *Id.* at 180-81.

This Court has added that "Rules 403 and 404(b) are not obstacles

to be cleared at all costs, even by cutting around corners whenever it is possible to do so. These rules were designed to ensure a defendant a fair and just trial[.]" *United States v. Foskey*, 636 F.2d 517, 525 (D.C. Cir. 1980). For this reason, "[t]here is a large measure of responsibility on the prosecutor to weigh the evidence independently: if its relevance is outweighed by the danger of unfairly prejudicing, confusing, or misleading the jury, it should not be introduced. *The assistant United States attorney must step back from his or her partisan role and make these determinations in an objective and fair-minded fashion before proffering the evidence.*" *Id.* at 525-26.

"The Government did not live up to that responsibility here." *Id.* at 526. It offered this evidence "freighted with guns, violent action and a wanted man" to cast Oseguera-Gonzalez as an arch-criminal who needed to be stopped. *United States v. James*, 555 F.2d 992, 1000 (D.C. Cir. 1977). "Given the slight probative force of this evidence, and its obvious potential for prejudice, [there is] no balance on which it properly could have been admitted." *Id.* at 1001.

The government may respond that count two substantially changes the Rule 403 calculus in its favor. But not so much. Recall that under

*Old Chief*, 519 U.S. at 184, "what counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." Thus, "when Rule 403 confers discretion by providing that evidence 'may' be excluded, the discretionary judgment may be informed not only by assessing an evidentiary item's twin tendencies, but by placing the result of that assessment alongside similar assessments of evidentiary alternatives." *Id.* at 184-85.

The consequence of this analytical model is, "[i]f an alternative [item of evidence] were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfairly prejudicial risk." *Id.* at 182-83.

This principle applies here. As reflected on the verdict form, in count two, Oseguera-Gonzalez was convicted of brandishing a firearm during and in relation to a drug trafficking crime, with at least one of the firearms qualifying as a destructive device. JA2083.

During trial, there was essentially uncontested testimony that

when officers arrested Oseguera-Gonzalez, he brandished a rifle with an attached grenade launcher. JA1024-27, 1042-43. A photo of that rifle with the grenade launcher was entered into evidence. JA493, 1024, 2131. Given the expert testimony that this grenade launcher qualified as a destructive device, the testimony from the arresting officer, and the documentary evidence, there was simply no need for the helicopter evidence or the lurid details of Officer Morales Corales's injury and painful recovery. JA1024-27, 1042-43, 1866-67.

The prosecution's closing argument proves the point: "Juan Perez told you that the defendant pointed a rifle with a grenade launcher on it at Mexican military and law enforcement officials and yelled: Let me go, I am CJNG . . . . *The evidence shows that 'brandished' should be checked*." JA1927. This argument establishes that the emotionally charged helicopter evidence was unnecessary because there was a far less prejudicial "evidentiary alternative[.]" *Old Chief*, 519 U.S. at 185. And when such an evidentiary alternative has "substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude[.]" *Id.* at 183.

In allowing the government to spend so much of the trial presenting sensational evidence about the helicopter attack, the deaths and injuries it caused, and the lives it ruined, the district court failed to exercise sound judicial discretion. *See id.*; *see also Hernandez v. Muniz*, 2019 U.S. Dist. LEXIS 71169, at *75 (N.D. Cal. 2019) ("the prosecution has no right to over-prove the case or put on all the evidence that they have."); *People v. Williams*, 170 Cal. App. 4th 587, 610 (2009) (same).

## B.     The unreliable and unfair graphic murder evidence.

The district court added to the Rule 403 prejudice by permitting the government to introduce and highlight Gomez-Ancira's fictional, graphic, and entirely gratuitous testimony that Oseguera-Gonzalez supposedly murdered five people by slitting their throats.

With the government's encouragement, Gomez-Ancira – the same fabulist who invented a story about hiding weapons and gold bars in caves – added to his spurious claims by testifying that he witnessed Oseguera-Gonzalez commit a heinous mass murder:

Q.     Can you tell the jury what you saw that day?

A.     Well, they -- well, they just had them there, kneeling, like this (indicating). He arrived, cut their necks, and just left them there, and we left.

Prosecutor: For the record, the witness used one hand to pull back on the top of his head so that his neck was exposed, and then made a slashing motion across his own throat while describing what he saw.

Q. And when you got there, where were these five men?

A. There, amongst the mangoes; they had them kneeling there.

Q. Okay. And who -- when you say, "they had them kneeling there," who is the "they"?

A. The people that allegedly owed him.

Q. All right. Were the people who owed him money being watched or guarded over by anyone else?

A. Yes. They were kneeling. They were tied by the hands and they had their heads to the back, and each had a hitman behind him.

Q. What did the defendant use to cut those five men's throats?

A. A knife that fits in the hand, and it's kind of like a half-moon. Like this (indicating).

Prosecutor: Let the record reflect the defendant [sic] held his fist up and, with his other hand, made a back-and-forth motion in the shape of a half-moon.

Q. Did the defendant say anything to the five men before he killed them?

A. Just that they didn't have to pay him anything.

Q. Okay. What did the defendant do after all five men were dead?

A. Nothing. He just left them there. He changed. He asked for a new shirt because his had blood, and we left.

JA1161-63.

Despite this testimony being entirely unsubstantiated – with no support in any law enforcement report or even any news article from Mexico – the prosecution highlighted it during the closing argument: "The defendant was proud, and he was arrogant. And while he was committing these crimes, he showed no remorse. Like when he had five men kneel on the ground with their hands tied behind their backs and, one by one, pulled their heads back and slit their throats. Because those men couldn't pay the defendant his drug money, they paid with their lives. And when the defendant was done and covered in blood, his only reaction was to ask for a clean shirt." JA1928.

The Supreme Court has advised that "[t]he likely damage [from erroneous admission of evidence] is best understood by taking the word of the prosecutor[.]" *Kyles v. Whitley*, 514 U.S. 419, 444 (1995). Here, both the testimony and the closing argument about these alleged murders were improper. The certainty of unfair prejudice arising from these alleged other crimes far outweighed any marginal probative value. The gruesome story would necessarily lead the jury to only one conclusion: Oseguera-Gonzalez was a killer who needed to be locked up.

Such an unfair appeal to emotion and prejudice has no place in a criminal trial, especially where there is no murder charge.

And "[w]hile such an argument is always to be condemned as an appeal wholly irrelevant to any facts or issues in the case and as a dereliction of the prosecutor's high duty to prosecute fairly, in the context of current events, raising the spectre of [heinous crimes] . . . . was an especially flagrant and reprehensible appeal to passion and prejudice. Although the prosecutor may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *United States v. Hawkins*, 480 F.2d 1151, 1154 (D.C. Cir. 1973).

In eliciting and repeating this evidence from a witness who was, at best, unreliable, the government struck a foul blow. The district court should have excluded the testimony and closing argument under Rule 403. *See United States v. Lentz*, 384 F. Supp. 2d 934, 949 (E.D. Va. 2005) ("The danger of unfair prejudice arises in this instance from the fact that the jury might conclude, inappropriately, that [the defendant] is simply a bad person or a heartless and uncaring individual[.]").

C.    The improper evidence of fentanyl production and trafficking.

Completing the trifecta of Rule 403 violations was the government's introduction of considerable other-act evidence regarding Oseguera-Gonzalez's alleged connection to fentanyl production and trafficking.

This evidence was not relevant to the charges of cocaine and methamphetamine conspiracy and was thus inadmissible.  As aptly stated in *United States v. Ivery*, 2017 U.S. Dist. LEXIS 26063, *16-17 (S.D. W.Va. 2017), "any mention of fentanyl . . . is not relevant to the instant offense. Certainly, the identification of a controlled substance that a defendant is accused of distributing is probative of the fact that the defendant distributed that substance. However, the Court does not view the identification of another controlled substance—of which Defendant is not charged with distribution—to be probative of any fact of consequence."

Even assuming, counterfactually, that the fentanyl evidence had some limited probative value, the unfair prejudice was manifest because "the [United States] is in the midst of a shockingly severe fentanyl crisis. U.S. drug overdose deaths rose over 400 percent from 2001 to 2021, largely due to fentanyl's rise as the nation's most deadly drug." *United*

*States v. Roy*, 88 F.4th 525, 532 (4th Cir. 2023). The danger posed by fentanyl is a regular part of the news cycle. It has become part of the cultural zeitgeist, familiar to every juror.

The government used this fear to its benefit, casting Oseguera-Gonzalez as the fentanyl boogeyman. Relying again on its prevaricator, Mr. Gomez-Ancira, the government solicited the following testimony:

Q. When you were working for Mencho, was the cartel manufacturing and selling fentanyl?

A. It was Menchito's idea to produce fentanyl, but for some reason his father didn't want to.

Q. When did the cartel start producing fentanyl?

A. It was in early 2013 when I realized.[6]

Q. Who told you that it was the defendant's idea to start manufacturing fentanyl?

A. Several people. But his father told me on one occasion and then I confirmed that when Menchito himself told me.

\*\*\*

Q. Did the defendant tell you where he was selling this fentanyl?

A. In Chicago. In New York. In Ohio. In other places. In LA. He mentioned those places.

---

[6] Oseguera-Gonzalez would have been 22 or 23 when he supposedly masterminded this effort.

56

Q.    Did the defendant tell you anything else about why the fentanyl was so much more valuable per kilogram than cocaine?

A.    He didn't tell me that exactly. He just told me that he was now building an empire with the cartel with fentanyl.

JA1088-89.

The government also solicited considerable testimony from Agent Paris about fentanyl and Oseguera-Gonzalez's role in its production:

Q.    [A]re there non-pharmaceutical fentanyl pills in the U.S.?

A.    Yes.

Q.    And how are those made?

A.    Well, those are counterfeit pills made in illicit laboratories.

Q.    When did fentanyl in that M-30 blue form come on the scene in the United States?

A.    I would say in the mid-to-late 2000s.

Q.    Mid-to-late 2000s?

A.    From -- it started to emerge in 2014. But nobody really knew the effects till after 2017.

Q.    Compared with methamphetamine and cocaine, is fentanyl more profitable or less profitable for drug traffickers?

A.    Well, it's extremely profitable because it's not derived -- well, neither is methamphetamine; but unlike most opioids like heroin or morphine, you don't have to grow a plant. You don't have to water it. You don't have to wait for it to be ready to be harvested. You don't have to pay people to harvest it. It's all, like, chemically

synthetic made. So it's inexpensive to make and very powerful.

Q. And is it profitable to sell as a drug?

A. Yeah. Extremely.

JA1648-49.

The government then had the agent interpret BBM conversations and opine: "I believe that they're specifically talking about fentanyl and making them into pills." JA1696.

Q. "The OxyContin." In the very last line, the reference to "OxyContin," what is that referring to?

A. I believe that – it's my opinion that the OxyContin refers to counterfeit OxyContin pills that are, in fact, fentanyl.

Q. Okay. And what else in these messages, specifically lines 5 and 6, helps you conclude that when Billy the Kid is talking about OxyContin what he is talking about is counterfeit OxyContin pills that contain fentanyl?

A. Well, this is -- we're talking about the same individual that they were calling "the engineer." They say he's brilliant in chemistry. We already discussed that his workshop is behind the carpentry shop and not an actual pharmacy or laboratory. And he is talking about making green pills, basically; that would be consistent with fentanyl.

Q. And there is a reference to: "Those are worth a lot of money." What, if anything, does that phrase play into your conclusion that the OxyContin pill that he's talking about is actually fentanyl?

Defense: Objection.

Court:    Overruled.

A.    Well, they're not talking about prescription pills that you can get from a doctor or at a pharmacy. In this case, clearly they intend to sell them and make a lot of money; and that would be consistent with selling fentanyl as opposed to actual OxyContin.

Q.    And why is that? Why would selling counterfeit OxyContin pills containing fentanyl -- why would that be more profitable than selling actual pharmaceutical OxyContin pills?

A.    Well, again, it's synthetic heroin. It's worth more. There is a lot more customers for it. I believe it's destined for the United States. It's not that somebody is just trying to get -- people buying it are not just trying to get OxyContin outside of a regular pharmacy.

JA1698-1700.

In closing argument, the government continued to press the fentanyl theme: "The defendant wanted to do it big. So the defendant agreed to release a kidnapped chemist if the chemist would agree to produce the ugly green pills, the OxyContin for the defendant. And you know from Special Agent Paris that those are both references to fentanyl. You also know from Special Agent Paris that *fentanyl began to show up on the scene in the United States just shortly after these messages that were sent in 2013*." JA1922.

The government doubled down in its rebuttal closing: "[W]e have these communications about the OxyContin and the kidnapped chemist.

The defendant kept this man tied up for almost three weeks.[7] And why did he let him go? Not out of the goodness of his heart, but because the chemist was going to make the little green pills for the defendant. The fentanyl. *This was October 2013. Right when fentanyl is emerging on the market in the United States.*" JA1976.

When this unduly prejudicial fentanyl evidence is viewed in context, the government's game plan is revealed. From the outset, it sought to portray Oseguera-Gonzalez as *personally* responsible for the fentanyl crisis in the United States. Beginning with Gomez-Ancira and his colorful imagination, the government placed the blame for the fentanyl production directly on Oseguera-Gonzalez, adding that even his father did not want to participate. The prosecution followed up on this theme with Agent Paris before bringing it all together in closing argument, depicting Oseguera-Gonzalez as the man responsible for bringing this scourge to the United States.

Considering that none of the charges had anything to do with fentanyl and the undeniably unfair prejudice, the court should have

---

[7] This kidnapping evidence should also have been excluded under Rules 401 and 403.

precluded this entire line of questioning and argument under Rule 403. *See*, *e.g.*, *United States v. Gutman*, 725 F.2d 417, 435 (7th Cir. 1984) ("Testimony which tends to induce a jury decision on an improper basis is exactly the type of evidence intended to be excluded under 403 if the prejudicial effect of such evidence substantially outweighs its probative value."); *United States v. Rogers*, 587 F.3d 816, 823 (7th Cir. 2009) ("a jury, uncertain of guilt, may convict a defendant because they think the defendant is a bad person generally deserving of punishment.").

***

In summary, as to all the evidence discussed above, to the extent it had any probative value, "there were certainly other ways the evidence could have been admitted so that the relevant aspects were retained and the prejudicial aspects minimized." *Carter,* 795 F.2d at 126. To borrow from this Court in *Carter*, "[t]he trial judge plainly lapsed in failing to restrict the method of [proof] so as to avoid the risk of unfair prejudice to the defendant[.]" *Id.* at 128. It could have allowed the government to make its points "with minimal risk of unfair prejudice by permitting only brief factual summaries of the allegations, which omit most of the color[.]" *Id.* "The only effect of such restriction would have been to guard against

the danger of unfair prejudice to the defendant[.]" *Id.*

The district court failed to guard against this danger. Not only was this error under the rules of evidence, but given the scope of improper evidence, it also rose to a constitutional violation. "Under our system of justice, all criminal defendants -- even those clearly guilty or otherwise reprehensible -- are entitled to a fair trial[.]" *United States v. Russell*, 221 F.3d 615, 623 (4th Cir. 2000); *see Poventud v. City of New York*, 750 F.3d 121, 137 (2d Cir. 2014). Oseguara-Gonzalez did not get the fair trial to which he was entitled. Reversal is required.

## IV.
## The flawed instruction on "other crimes" evidence.

That remedy is particularly appropriate because the prejudice just discussed was compounded by the district court's muddled instruction on "other crimes" evidence. The instruction stated:

> You have heard evidence that defendant Ruben Oseguera Gonzalez engaged in crimes not charged in Count 1 or Count 2. It is up to you to decide whether to accept that evidence.

> You must first decide, without considering this evidence of other crimes at all, whether the government has proved beyond a reasonable doubt that an agreement existed to knowingly or intentionally distribute cocaine and methamphetamine, knowing or intending that the drugs would be unlawfully imported into the

United States.

If you find that the government has proved beyond a reasonable doubt that an agreement existed, then you may consider the evidence that the defendant engaged in crimes not charged in Counts 1 or 2.

If you find that Ruben Oseguera Gonzalez engaged in crimes not charged in Counts 1 or 2, you may use this evidence for the limited purpose of determining whether the government has proved beyond a reasonable doubt that Mr. Oseguera Gonzalez knew of the unlawful purpose of the agreement and that he joined in the agreement knowingly and willfully; that is with the intent to further its unlawful purpose.

You may also use this evidence for the limited purpose of deciding whether Mr. Oseguera Gonzalez had the motive, opportunity, intent, or knowledge to commit the charged offenses, whether he prepared or planned to commit the charged offenses, and whether there was an absence of mistake or lack of accident.

You may also use this evidence in determining whether the government has proved beyond a reasonable doubt that Mr. Oseguera Gonzalez committed the charged offenses.

You may not use evidence of crimes not charged in Counts 1 or 2 for any other purpose. You may not use this evidence to conclude that he has a bad character, that he has a criminal personality. The law does not allow you to convict Mr. Oseguera Gonzalez simply because you believe he may have done bad things, not specifically charged as crimes in this case.

JA1996-97.

This instruction represents the worst kind of legal fiction. It required the jurors to compartmentalize evidence as if they were machines. The instruction began by telling the jurors to completely ignore the other crimes evidence in determining whether a conspiracy existed, but then to consider the evidence for various purposes. Such mental gymnastics have no basis in reality.

Telling a juror to first ignore evidence and then consider it is like showing someone what is hidden inside a box and then telling them to guess what is inside without considering what they just saw. That is not how our brains work. As the Fifth Circuit put it, "if you throw a skunk into the jury box, you can't instruct the jury not to smell it." *United States v. Garza* 608 F.2d 659, 666 (5th Cir. 1979).

The instruction then continued its confusing path by providing conflicting directions. It said the other crimes could be considered for two limited purposes, but then said those crimes could also be used to determine "whether the government has proved beyond a reasonable doubt that Oseguera-Gonzalez committed the charged offenses," which is the opposite of a limited purpose. JA1996-97.

The instruction, therefore, would lead any juror into a mental morass. "While we presume jurors follow the instructions they are given, we cannot equally assume they can sort out legal contradictions." *Doe v. Busby*, 661 F.3d 1001, 1023 (9th Cir. 2011). The most likely scenario is the one we all know reflects reality; the jury would use the other, unproven crimes to find Oseguera-Gonzalez guilty on an improper basis.

When the jury is told the defendant committed multiple murders, ordered a military helicopter shot down, kidnapped a man and held him hostage for three weeks, and is responsible for the fentanyl crisis, that evidence is going to impact its judgment. It just will. *See People v. Fritz,* 153 Cal. App. 4th 949, 962 (2007) ("A limiting instruction warning jurors they should not think about the elephant in the room is not the same thing as having no elephant in the room."). This creates a serious due-process problem.

First, as the instruction acknowledges, it opened the door to jurors convicting because they believed the defendant had "done bad things." JA1997. Second, the instruction diluted the burden of proof by allowing the jury to rely on other crimes that were not proven beyond a reasonable doubt. That is, the instruction permitted the jury to base its verdict on

unproven (and uncharged) prior crimes. *See Doe*, 661 F.3d at 1023 ("The instructions directed the jury to consider evidence of Doe's prior unadjudicated acts of domestic violence . . . to convict him . . . . This was error[.]"). In doing so, it undermined the foundation of due process embodied in the beyond-a-reasonable-doubt standard. *See Mosley v. AG Pa.*, 2022 U.S. App. LEXIS 732, *5 (3d Cir. 2022) ("A jury instruction that lowers the prosecution's burden of proof is a violation of constitutional due process.") (citing *Francis v. Franklin*, 471 U.S. 307, 313 (1985)).

This is not to say the court should have remained silent. Had it simply instructed the jury that it could consider the other act evidence only for the two limited purposes identified in the instruction – whether he joined the conspiracy and whether he had the motive, opportunity, etc., to commit the charged crimes – perhaps the legal fiction of jury compliance could have held.

That was the situation in *United States v. McGill*, 815 F.3d 846, 887 (D.C. Cir. 2016). There, the district court gave a clear instruction, which ended with the following: "the fact that a defendant broke the law on other occasions not charged in these indictments is not by itself evidence that he committed any offense for which he is now on trial." *Id.*

On appeal, this Court held that the instruction "adequately guided the jury's consideration." *Id.* at 888.

Here, it was the opposite. Assuming the jury could have ever put the vast helicopter, murder, kidnapping, and fentanyl evidence out of its mind, it was never told that this evidence could not be considered as proof that he had a propensity to commit the charged offenses. On the contrary, the court essentially instructed the jury to do the opposite. JA1996-97. The impermissible and permissible purposes were mashed together in one confusing instruction, making it impossible for the jurors to limit their consideration of other-act evidence. That is improper and prejudicial.

This is true when the erroneous instruction is considered on its own, but even more so when evaluated as part of a cumulative error analysis.[8] "[A]lthough certain errors standing alone might be insufficient to overturn a verdict, these errors may exert a cumulative effect such as to warrant reversal. The critical inquiry is an analysis of the probable

---

[8] Review of this instruction is likely for plain error. JA1890. For the reasons explained in this section, however, that standard is satisfied. The instruction was plainly erroneous, without legal basis, and prejudicial.

impact, appraised realistically, of the particular [errors] upon the jury's factfinding function." *United States v. Brown*, 508 F.3d 1066, 1076 (D.C. Cir. 2007). Here, "the probable impact, appraised realistically" of the evidentiary errors *and* the flawed instruction would be to taint the jury's factfinding function. Regardless of the standard of review, such tainted convictions cannot stand.

## V.
### Sentencing error.

Nor can the sentence. The district court's sentencing calculations were based on a factual statement drafted by the government during plea negotiations. That statement, however, was inadmissible against Oseguera-Gonzalez at sentencing. *See* Federal Rules of Evidence 410(a)(4) and 1101(c).[9]

This Court reviews de novo the proper interpretation of the Federal Rule of Evidence. *See United States v. Gewin*, 471 F.3d 197, 200 (D.C. Cir. 2006) ("A district court's interpretation of the Federal Rules of Evidence is a question of law, which we review de novo."); *Handy v. Shaw, Bransford, Veilleux & Roth*, 325 F.3d 346, 349 (D.C. Cir. 2003) ("Whether

---

[9] This argument applies to the count-1 sentence. The concurrent 30-year sentence on count 2 was a mandatory minimum.

the lower court applied the proper legal standard in exercising [its] discretion [] is a question of law reviewed de novo.").  The Court reviews for abuse of discretion "a district court's evaluation of the reliability of [] evidence at sentencing." *United States v. Leyva*, 916 F.3d 14, 25 (2019).

## A.  Relevant facts.

Before trial, but after the parties engaged in lengthy plea negotiations, the government offered Oseguera-Gonzalez a plea agreement.  It included a "Joint Statement of Stipulated Facts." JA 301-07.  This document was referred to below as the Statement of Facts or "SOF."  The SOF, drafted by the prosecution, contained the government's factual allegations.  JA301-07.  The draft plea agreement mandated that Oseguera-Gonzalez sign the SOF and affirm "the truth of the facts [the government] set forth in the Statement of Facts." JA 307.

However, the government did not provide a written Spanish translation of the SOF for Oseguera-Gonzalez to review, despite knowing that it was his native language.  Nor was the SOF ever translated into Spanish for Oseguera-Gonzalez by a court-certified interpreter (of note, he used a court-certified interpreter throughout the trial).  JA1515.  Instead, Oseguera-Gonzalez's former attorney purportedly explained the

SOF to him in Spanish.  JA 307.  On the signature page, the following appeared as crossed-out text:

> I have reviewed this Plea Agreement ~~with the assistance of an English-Spanish interpreter~~, and have discussed it at length with my attorney, Danny Onorato, Esq.  ~~This Plea Agreement has been translated into Spanish for me.  I understand the English version controls~~.

JA 307.

Oseguera-Gonzalez – without the benefit of a certified interpreter – ultimately signed the government's statement as part of his plea negotiations, but then quickly decided not to proceed with the guilty plea. He discharged his attorney, hired new counsel, and opted for a jury trial. As a result, there was no plea colloquy, and no findings were made as to his understanding.

In preparing for the trial, the government sought to admit the SOF, while the defense sought to exclude it.  JA264-87, JA308-17.  The district court granted the defense's motion to exclude the statement.  JA529.  It explained, "Federal Rule of Criminal Procedure 11 and FRE 410 limit the admissibility of a plea, a plea discussion, and any related statement. In relevant part, FRE 410 makes inadmissible against a defendant any statement the defendant 'made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty

plea or they resulted in a later-withdrawn guilty plea.'" JA515.

The court concluded, "the SOF was a statement made prior to the 'formalization of the plea agreement,' and was 'part of [the parties'] efforts to dispose of the matter-through extraction of information from [defendant] and, possibly, a plea.'" JA518. Thus, citing "Rule ll(f) and FRE 410," the court held that the "SOF is inadmissible." JA529.

However, when it came time for sentencing, the district court reversed course. Over repeated objections, JA2257-68, the court determined that the "information from the SOF is going to be used [] during the course of this sentencing, and *the Court has relied on it during the course of this sentencing.*" JA2278-79. The court concluded, "[t]he defendant's admissions [in the SOF] alone may establish a factual basis to support a sentencing enhancement as they do here[.]" JA 2282. Based on that conclusion, the court relied on the SOF to calculate the offense level as follows:

| | |
|---|---|
| Base offense level U.S.S.G. § 2D1.1(c)(1) | 38 |
| Violence U.S.S.G. § 2D1.1(b)(2) | +2 |

| | |
|---|---|
| Distribution of drugs in prison<br>U.S.S.G. § 2D1.1(b)(4) | +2[10] |
| Importation of drugs<br>U.S.S.G. § 2D1.1(b)(5) | +2 |
| Bribery<br>U.S.S.G. § 2D1.1(b)(11) | +2 |
| Maintaining a drug premises<br>U.S.S.G. § 2D1.1(b)(12) | +2 |
| Pattern of criminal livelihood<br>U.S.S.G. § 2D1.1(b)(16)(E) | +2 |
| Restraint of a victim<br>U.S.S.G. § 3A1.3 | +2 |
| Aggravating role<br>U.S.S.G. § 3B1.1(a) | +4 |
| Adjusted offense level | 56 |
| Total offense level<br>U.S.S.G. Chapter 5 n. 2<br>(Offense Level cap) | 43 |

JA2302-06.

In support of the enhancements, the court began by explaining, "looking at the evidence that exists for the violence [enhancement], I think the admissions made in the statement of facts fully support it."

_____

[10] The court was unclear as to whether it ultimately applied this enhancement. JA 2350-51.

JA2325; *also* JA2348-49("the statement of facts, at paragraph 4, talks about the CJNG also using extreme violence").

Similarly, the court found, "[w]ith respect to [] bribery of an officer, under 2D1.1(b)(11), the statement of facts, at paragraph 12, states that the defendant admits bribing Mexican law enforcement police officers to get documents to help El Mencho evade capture." JA2349; *also* JA2325 ("for bribery of an officer, the statement of facts, at paragraph 12, where it has the defendant admitting he bribed Mexican federal police officers").

Moving to the increase for "maintaining premises under 2D1.1(b)(12)," the court cited "the statement of facts, at paragraph 5, [that] talks about the defendant routinely visiting meth labs and overseeing operations at the meth labs, which is a form of maintaining premises, warranting application of that [increase]." JA2349.

For the "criminal livelihood enhancement at 2D1.1(b)(16)(E) . . . the statement of facts, paragraphs 2 through 4, the defendant admitted to being a leader of the CJNG, which had extensive drug trafficking activities . . . and he had a supervisory role of multiple meth labs; this was all supportive of the criminal livelihood enhancement." JA2349-50.

Turning to "[t]he restraint of a victim enhancement, under the

guideline at 3A1.3 . . . . The defendant admitted -- in paragraph 13 of the SOF, as corroborated by BBM communications -- that he engaged in the kidnapping of an individual and his 12 workers for distributing drugs in CJNG territory; so he had to physically restrain them by locking them up to effectuate the kidnapping." JA2350.

As to aggravating role, "starting with the statement of facts . . . that would be enough to find him a leader of CJNG." JA2295. "Regardless of the credibility of the six cooperating witnesses who testified at trial, the defendant's own admission in the [SOF] . . . made clear that he was one of the leaders of CJNG." JA2299.

As this summary shows, the court's guidelines analysis was primarily driven by the SOF. That was a significant prejudicial error.

## B. The statement of facts was inadmissible at sentencing under Rule 410(a)(4) and 1101(c).

### 1. At sentencing, the Federal Rules of Evidence governing privilege remain applicable.

Federal Rule of Criminal Procedure 11(f)(4) provides: "The admissibility or inadmissibility of a plea, a plea discussion, *and any related statement* is governed by Federal Rule of Evidence 410." Rule 410(a)(4), in turn, says: "In a civil or criminal case, evidence of the

following is not admissible against the defendant who made the plea or participated in the plea discussions: . . . a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea."

The district court correctly recognized that under Rule 410(a)(4), the SOF was inadmissible at trial, but it erroneously believed the prohibition did not extend to sentencing, stating: "[T]here is no evidentiary rule or procedural rule that bars consideration of the defendant's admissions in connection with plea negotiations or a plea hearing at the time of sentencing." JA2262. This was incorrect as a matter of law.

Although many rules of evidence do not extend beyond the trial context, Rule 410(a)(4) does. This conclusion follows from Rule 1101(c), which states: "The *rules on privilege* apply to all stages of a case or proceeding." Rule 1101(d)(3) confirms: "These rules [the Federal Rules of Evidence]—*except for those on privilege*—do not apply to the following: [S]entencing." So, if Rule 410(a)(4) is a rule on privilege, it continues to apply at sentencing. And as demonstrated below, it is and it does.

2. <u>Rule 410(a)(4) is a rule on privilege</u>.

The "privilege against self-incrimination" is perhaps the most important evidentiary privilege. *Michigan v. Tucker*, 417 U.S. 433, 439-40 (1974). It traces back to early English common law and serves as "the mainstay of our adversary system of criminal justice" as well as "one of the great landmarks in man's struggle to make himself civilized." *Id.* at 439.

"Although the constitutional language in which the privilege is cast might be construed to apply only to situations in which the prosecution seeks to call a defendant to testify against himself at his criminal trial, its application has not been so limited. The right has been held applicable to proceedings before a grand jury, to civil proceedings, to congressional investigations, to juvenile proceedings, and to other statutory inquiries. The privilege has also been applied against the States by virtue of the Fourteenth Amendment." *Id.* at 440.

Furthermore, the Supreme Court has held that the privilege against self-incrimination applies during the sentencing phase of a criminal proceeding. *Mitchell v. United States*, 526 U.S. 314, 328-29, (1999) ("In accordance with the text of the Fifth Amendment, we must

accord the privilege [against self-incrimination] the same protection in the sentencing phase of 'any criminal case' as that which is due in the trial phase of the same case.").

Thus, because (1) rules on privilege apply during sentencing proceedings, and (2) the privilege against self-incrimination is such a privilege, any evidentiary rule implementing the privilege against self-incrimination must apply during sentencing proceedings.

Rule 410(a)(4) is precisely that. On this point, the Court's decision *United States v. Davis*, 617 F.2d 677 (D.C. Cir. 1979), is controlling.

In *Davis*, the Court undertook a detailed analysis of the prior version of what would become Rule 410. Similar to the current language, it provided: "evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer." *Id.* at 682 (quoting the prior version of Federal Rule of Criminal Procedure 11(e)(6)).

The Court explained, this rule "seeks to promote negotiated

dispositions of criminal cases by giving the defendant protection from involuntary self-incrimination at two ends of the plea-bargaining spectrum: while he is negotiating over the disposition of his case and while he is offering or entering a plea that is rejected or later withdrawn." *Id.* at 683.

The Court continued, the rule "focuses primarily on the negotiation stage. It derives from the inescapable truth that for plea bargaining to work effectively and fairly, a defendant must be free to negotiate without fear that his statements will later be used against him." *Id.* Indeed, "Congress, when it considered this provision, suggested that absent such a shield the possibility of self-incrimination would 'discourage defendants from being completely candid and open during plea negotiations[.]'" *Id.*

As *Davis* explains, the privilege against self-incrimination is at the heart of Rule 410(a)(4). The Rule is designed to safeguard the privilege in the plea-bargaining context, which is itself an essential part of the judicial system. *See Missouri v. Frye*, 566 U.S. 134, 143 (2012) ("ours is for the most part a system of pleas, not a system of trials). Accordingly, because Rule 410(a)(4) cannot be divorced from its critical purpose of protecting the privilege against self-incrimination in plea negotiations, it

qualifies as a "rule on privilege."

Further support for this conclusion comes from Federal Rule of Evidence 501. That Rule provides: "The common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege unless any of the following provides otherwise:

- the United States Constitution;

- a federal statute; or

- rules prescribed by the Supreme Court."

The privilege against self-incrimination originates from common law and is enshrined in the Fifth Amendment. Moreover, Rule 410(a)(4) is prescribed by the Supreme Court. *See* 28 U.S.C. § 2072(a). As such, it fits neatly within Rule 510's discussion of evidentiary privileges.

With that point established, the rest of the analysis falls into place. Having previously (and correctly) concluded that the SOF was inadmissible under Rule 410(a)(4), the district court erred in relying on it in sentencing Oseguera-Gonzalez.

3. <u>To the extent the government argues for plain-error review, the claim is without merit</u>.

The government may respond that reversal is unwarranted because plain-error review applies and the error was not plain. The argument is

misplaced.

First, the defense repeatedly objected to the court's reliance on the SOF at sentencing. JA2257-68. Although counsel did not raise an independent argument under Rule 410, the district court was well aware of, and expressly ruled on, the issue. It found, "Federal Rule Evidence 410 doesn't apply at sentencing pursuant to Federal Rule of Evidence 1101(d)(3) and Federal Rule of Criminal Procedure 11(f), which relates to the inadmissibility of plea-related documents, which is also governed by Rule 410." JA2261.

Based on this ruling, the issue is preserved for appellate review. "Even if [the defendant] had forfeited his [] challenge, de novo review of a forfeited issue is permitted where the lower court has 'nevertheless addressed the merits of the issue.' This principle applies in both criminal and civil cases." *Ali Hamza Ahmad Suliman Al Bahlul v. United States*, 767 F.3d 1, 48 (D.C. Cir. 2014); *see also United States v. Thorpe*, --- F.4th ---, No. 23-3027 (D.C. Cir. 2025) ("Because the issue was raised and addressed by the district court, we may consider it here."); *United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1328 (10th Cir. 2003) (When the district court resolves an issue not raised by the defendant, "review on

appeal is not for 'plain error,' but is subject to the same standard of appellate review that would be applicable if the appellant had properly raised the issue."). In short, because the district court addressed the merits of the Rule 410 issue, this Court continues to review the proper interpretation of that rule de novo.

But even if plain-error review applied, the standard is met. The unambiguous text of the relevant rules, combined with long-standing precedent, shows that the district court plainly erred. *See United States v. Head*, 817 F.3d 354, 361 (D.C. Cir. 2016) ("one circumstance in which an error may be plain is if, at the time it was made, a clear precedent in the Supreme Court or this circuit established its erroneous character."). The error, moreover, affected Oseguera-Gonzalez's substantial rights and fairness of the proceedings because it resulted in a flawed guidelines calculation and a potentially higher *life* sentence.[11]

> 4. <u>Oseguera-Gonzalez's signature cannot validate the statement of facts because it was never properly translated.</u>

Another problem with the court's reliance on that SOF is that its complex factual recitation, replete with terminology carrying specific

---

[11] More on prejudice in the final subsection of this argument.

legal ramifications, was never translated for Oseguera-Gonzalez by a court-certified interpreter, either in writing or verbally. Although there was evidence that he knew some English, he used a certified interpreter throughout the trial, and understanding the precise wording of the SOF was crucial. Nor is it sufficient that his attorney at the time supposedly spoke both Spanish and English.

This point was discussed at length in *United States v. Bailon-Santana*, 429 F.3d 1258, 1259-60 (9th Cir. 2005), where the court considered the validity of a jury waiver translated by the defendant's lawyer, rather than a court-certified interpreter.

The defendant, "a Mexican native, communicated with the court through a court-certified interpreter during the proceedings. Before trial, he signed a jury waiver form pursuant to Federal Rule of Criminal Procedure 23(a)(1), but the form was printed only in English. His attorney represented both on the form and in court that he had translated the form into Spanish for his client." *Id.* Additionally, "[t]he district court asked defendant whether he had waived his jury trial right and the defendant answered in the affirmative. The court then accepted the waiver and proceeded to hold a bench trial. Bailon-Santana was convicted

and sentenced to thirty years in prison." *Id.* at 1260.

The court of appeals reversed, explaining:

> In federal courts, translations for criminal defendants and witnesses who are not fluent in English are normally provided by certified experts. Congress requires federal courts to certify interpreters, like the one who translated for Bailon-Santana throughout the proceedings, for use in federal judicial proceedings. To be certified as a Spanish federal-court interpreter, an applicant must pass a rigorous written and oral examination, which requires native-level mastery of both English and Spanish. *Many people claim "fluency'" in a foreign language, but "[t]here are few persons in the United States who can interpret with the degree of precision and accuracy required at the Federal court level."*

*Id.* For this reason, "[j]urors who consider their own translation skills superior to those of the certified interpreter are nevertheless instructed to consider only the certified translation." *Id.*

Turning to the facts before it, the court noted: "Bailon-Santana's lawyer is not certified as a Spanish-English interpreter—at least the record does not reflect that he is. Rather, in a signed statement he filed with the court, the attorney represented that he is 'fluent in written and spoken English and Spanish languages' and that he 'accurately translated this entire waiver from English into Spanish to defendant

Gilberto Bailon-Santana.'" *Id.* "At the jury waiver hearing, the court asked the defense attorney whether he had translated the waiver, and the attorney reiterated that he had done so." *Id.* at 1261.

The Ninth Circuit held that "[w]hile the lawyer's statements are reassuring, and his representation that he is fluent in Spanish was no doubt entirely candid, his statement nonetheless lacks one crucial component: confirmation by someone familiar with the requisite standard that the lawyer's fluency is commensurate with the level required for translating the sometimes difficult words and concepts used in federal criminal cases." *Id.*

To this end, "[c]ertification as an official court interpreter is one way of ensuring competence, but it is not the only way. Where a certified interpreter is not 'reasonably available,' Federal Rule of Evidence 604 provides a means for the court to qualify an individual as an interpreter, employing the methodology used for qualifying expert witnesses. One way or the other, however, the record must reflect a determination, based on something more than the individual's say-so, that he has the requisite translating ability." *Id.*

But it did not; "[t]he record [] reflects only the defense lawyer's self-

assessment. While we don't doubt that he was entirely truthful, we have no way of knowing whether he is even familiar with the standard used to certify interpreters, and thus we cannot be sure that his Spanish-speaking ability is as good as he believes it to be. . . . And [] the district court must make a finding that the interpreter is qualified as an expert witness and is competent to serve as an interpreter in a federal criminal proceeding. None of this happened here. Rather, the district court seems to have accepted the lawyer's self-certification at face value." *Id.*

This was error. "Absent a properly-translated jury form . . . the jury trial waiver was invalid, and we must reverse the conviction." *Id.*

The same rationale applies here, but with even greater force. Because there is no evidence that the SOF was translated for Oseguera-Gonzalez by someone with sufficient qualifications under federal law, his signature on the SOF cannot serve to validate the accuracy of the government's assertions. Absent the proper translation, the signature is essentially meaningless because there is no basis to conclude Oseguera-Gonzalez fully understood what he was signing.

Moreover, in *Bailon-Santana*, the district court at least engaged in a colloquy with the defendant about the waiver. But here, there was no

Rule 11 colloquy and no judicial finding that Oseguera-Gonzalez understood the SOF. This, in turn, further militated against using the SOF for sentencing purposes.

\* \* \*

The district court erred in relying on the SOF at sentencing because: (1) Rule 410 is a rule on privilege that applies at sentencing to prohibit considerations of statements made during unconsummated plea negotiations; and (2) there was insufficient evidence of reliability to satisfy due process because the SOF was never translated into Spanish for Oseguera-Gonzalez by a court-certified interpreter and the court never conducted a Rule 11 colloquy to confirm his understanding.

5. The government cannot establish harmless error.

Finally, the government bears the burden of showing that the district court's sentencing error was harmless. *See United States v. Simpson*, 430 F.3d 1177, 1184 (D.C. Cir. 2005). Here, it cannot.

To review, the parties agreed to a base offense level of 38, given the quantity of drugs. The defense also did not object to a 2-level enhancement for importation under U.S.S.G. § 2D1.1(b)(5). However, in imposing the remaining 16 levels of enhancements, the district court

expressly relied on the SOF. As discussed above, the court used the SOF to justify every increase. JA 2278-79, 2295-99, 2325, 2348-50.

Accordingly, absent that erroneous reliance on the SOF, the offense level would likely have been 40 (38 + 2 for importation). In Criminal History Category I, his sentencing range would have been 292-365 months, far below the life sentence imposed.[12] In this context, the error simply cannot be considered harmless because "[a] district court that 'improperly calculat[es]' a defendant's Guidelines range [] has committed a 'significant procedural error.'" *Martinez v. United States*, 578 U.S. 189, 199 (2016) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

"When a defendant is sentenced under an incorrect Guidelines range . . . the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *United States v. Parks*, 995 F.3d 241, 246 (D.C. Cir. 2021). That is true in this case. The district court said, "I do plan to give a Guideline sentence." JA2360. A Guideline sentence would be less than life.

The Court, therefore, should remand for resentencing. In doing so, it should refer the case to a different district judge because the current

---

[12] A lesser sentencing range would also apply at levels 41 and 42.

judge, having heavily relied on the SOF, cannot reasonably be expected to put that information out of her mind. *See* 28 U.S.C. § 2106; *Mawson v. United States*, 463 F.2d 29, 31 (1st Cir. 1972) ("It is difficult for a judge, having once made up h[er] mind, to resentence a defendant, and both for the judge's sake, and the appearance of justice, we remand this case to be redrawn.").

## VI.
## Argument for preservation.

Acknowledging this Court's decision in *United States v. Sota*, 948 F.3d 356, 362 (D.C. Cir. 2020), Oseguera-Gonzalez maintains that his count-2 conviction fails because 18 U.S.C. § 924(c) does not apply extraterritorially. All of the alleged conduct underlying count 2 took place in Mexico and did not target the United States. However, given this Court's binding precedent, Oseguera-Gonzalez had no cause to raise the claim in district court. He preserves it for further review.

Respectfully submitted,

 *s/ Devin Burstein*

October 24, 2025

Devin Burstein
Warren & Burstein

CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume limit, Typeface Requirements, and Type-Style Requirements:

This brief has been prepared using Microsoft Word in 14-pt Century font. It contains 17,187 words. The Court has granted my motion to file this over-length brief.

*s/ Devin Burstein*
Devin Burstein
Warren & Burstein
501 W. Broadway, Ste 240
San Diego, CA 92101
(619) 234-4433

## CERTIFICATE OF SERVICE

I certify that on October 24, 2025, I caused a copy of the Appellant's Opening Brief to be filed with the Clerk of the Court via the Electronic Case Filing System, which electronically served them upon the following:

USAO Appellate Counsel
Firm: 202-252-6829
Email: USADC.ECFAppellate@usdoj.gov
U.S. Attorney's Office Appellate Division
601 D Street, NW
Washington, DC 20530

*s/ Devin Burstein*
Devin Burstein
Warren & Burstein
501 W. Broadway, Ste 240
San Diego, CA 92101
(619) 234-4433

# ADDENDUM

United States Code Annotated
    Federal Rules of Evidence (Refs & Annos)
        Article IV. Relevance and Its Limits

Federal Rules of Evidence Rule 403, 28 U.S.C.A.

Rule 403. Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons

Currentness

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1932; Apr. 26, 2011, eff. Dec. 1, 2011.)

**ADVISORY COMMITTEE NOTES**
**1972 Proposed Rules**

The case law recognizes that certain circumstances call for the exclusion of evidence which is of unquestioned relevance. These circumstances entail risks which range all the way from inducing decision on a purely emotional basis, at one extreme, to nothing more harmful than merely wasting time, at the other extreme. Situations in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission. Slough, Relevancy Unraveled, 5 Kan.L.Rev. 1, 12-15 (1956); Trautman, Logical or Legal Relevancy--A Conflict in Theory, 5 Van.L.Rev. 385, 392 (1952); McCormick § 152, pp. 319-321. The rules which follow in this Article are concrete applications evolved for particular situations. However, they reflect the policies underlying the present rule, which is designed as a guide for the handling of situations for which no specific rules have been formulated.

Exclusion for risk of unfair prejudice, confusion of issues, misleading the jury, or waste of time, all find ample support in the authorities. "Unfair prejudice" within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.

The rule does not enumerate surprise as a ground for exclusion, in this respect following Wigmore's view of the common law. 6 Wigmore § 1849. Cf. McCormick § 152, p. 320, n. 29, listing unfair surprise as a ground for exclusion but stating that it is usually "coupled with the danger of prejudice and confusion of issues." While Uniform Rule 45 incorporates surprise as a ground and is followed in Kansas Code of Civil Procedure § 60-445, surprise is not included in California Evidence Code § 352 or New Jersey Rule 4, though both the latter otherwise substantially embody Uniform Rule 45. While it can scarcely be doubted that claims of unfair surprise may still be justified despite procedural requirements of notice and instrumentalities of discovery, the granting of a continuance is a more appropriate remedy than exclusion of the evidence. Tentative Recommendation and a Study Relating to the Uniform Rules of Evidence (Art. VI. Extrinsic Policies Affecting Admissibility), Cal.Law Revision Comm'n, Rep., Rec. & Studies, 612 (1964). Moreover, the impact of a rule excluding evidence on the ground of surprise would be difficult to estimate.

In reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction. See Rule 106 [now 105] and Advisory Committee's Note thereunder. The availability of other means of proof may also be an appropriate factor.

**2011 Amendments**

The language of Rule 403 has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility.

Notes of Decisions (3209)

Fed. Rules Evid. Rule 403, 28 U.S.C.A., FRE Rule 403
Including Amendments Received Through 10-1-2025

**WESTLAW** © 2025 Thomson Reuters. No claim to original U.S. Government Works.    2

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article IV. Relevance and Its Limits

Federal Rules of Evidence Rule 410, 28 U.S.C.A.

Rule 410. Pleas, Plea Discussions, and Related Statements

Currentness

**(a) Prohibited Uses.** In a civil or criminal case, evidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions:

**(1)** a guilty plea that was later withdrawn;

**(2)** a nolo contendere plea;

**(3)** a statement made during a proceeding on either of those pleas under Federal Rule of Criminal Procedure 11 or a comparable state procedure; or

**(4)** a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea.

**(b) Exceptions.** The court may admit a statement described in Rule 410(a)(3) or (4):

**(1)** in any proceeding in which another statement made during the same plea or plea discussions has been introduced, if in fairness the statements ought to be considered together; or

**(2)** in a criminal proceeding for perjury or false statement, if the defendant made the statement under oath, on the record, and with counsel present.

**CREDIT(S)**
(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1933; Pub.L. 94-149, § 1(9), Dec. 12, 1975, 89 Stat. 805; Apr. 30, 1979, eff. Dec. 1, 1980; Apr. 26, 2011, eff. Dec. 1, 2011.)

**ADVISORY COMMITTEE NOTES**
**1972 Proposed Rules**

Withdrawn pleas of guilty were held inadmissible in federal prosecutions in *Kercheval v. United States,* 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927). The Court pointed out that to admit the withdrawn plea would effectively set at naught the allowance of withdrawal and place the accused in a dilemma utterly inconsistent with the decision to award him a trial. The New York

Court of Appeals, in *People v. Spitaleri,* 9 N.Y.2d 168, 212 N.Y.S.2d 53, 173 N.E.2d 35 (1961), reexamined and overturned its earlier decisions which had allowed admission. In addition to the reasons set forth in Kercheval, which was quoted at length, the court pointed out that the effect of admitting the plea was to compel defendant to take the stand by way of explanation and to open the way for the prosecution to call the lawyer who had represented him at the time of entering the plea. State court decisions for and against admissibility are collected in Annot., 86 A.L.R.2d 326.

Pleas of *nolo contendere* are recognized by Rule 11 of the Rules of Criminal Procedure, although the law of numerous States is to the contrary. The present rule gives effect to the principal traditional characteristic of the *nolo* plea, i.e. avoiding the admission of guilt which is inherent in pleas of guilty. This position is consistent with the construction of Section 5 of the Clayton Act, 15 U.S.C. § 16(a), recognizing the inconclusive and compromise nature of judgments based on *nolo* pleas. *General Electric Co. v. City of San Antonio,* 334 F.2d 480 (5th Cir.1964); *Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co.,* 323 F.2d 412 (7th Cir.1963), cert. denied 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659; *Armco Steel Corp. v. North Dakota,* 376 F.2d 206 (8th Cir.1967); *City of Burbank v. General Electric Co.,* 329 F.2d 825 (9th Cir.1964). See also state court decisions in Annot., 18 A.L.R.2d 1287, 1314.

Exclusion of offers to plead guilty or *nolo* has as its purpose the promotion of disposition of criminal cases by compromise. As pointed out in McCormick § 251, p. 543.

"Effective criminal law administration in many localities would hardly be possible if a large proportion of the charges were not disposed of by such compromises."

See also *People v. Hamilton,* 60 Cal.2d 105, 32 Cal.Rptr. 4, 383 P.2d 412 (1963), discussing legislation designed to achieve this result. As with compromise offers generally, Rule 408, free communication is needed, and security against having an offer of compromise or related statement admitted in evidence effectively encourages it.

Limiting the exclusionary rule to use against the accused is consistent with the purpose of the rule, since the possibility of use for or against other persons will not impair the effectiveness of withdrawing pleas or the freedom of discussion which the rule is designed to foster. See A.B.A. Standards Relating to Pleas of Guilty § 2.2 (1968). See also the narrower provisions of New Jersey Evidence Rule 52(2) and the unlimited exclusion provided in California Evidence Code § 1153.

## 1974 Enactment

The Committee added the phrase "Except as otherwise provided by Act of Congress" to Rule 410 as submitted by the Court in order to preserve particular congressional policy judgments as to the effect of a plea of guilty or of nolo contendere. See 15 U.S.C. 16(a). The Committee intends that its amendment refers to both present statutes and statutes subsequently enacted. House Report No. 93-650.

As adopted by the House, rule 410 would make inadmissible pleas of guilty or nolo contendere subsequently withdrawn as well as offers to make such pleas. Such a rule is clearly justified as a means of encouraging pleading. However, the House rule would then go on to render inadmissible for any purpose statements made in connection with these pleas or offers as well.

The committee finds this aspect of the House rule unjustified. Of course, in certain circumstances such statements should be excluded. If, for example, a plea is vitiated because of coercion, statements made in connection with the plea may also have been coerced and should be inadmissible on that basis. In other cases, however, voluntary statements of an accused made in court on the record, in connection with a plea, and determined by a court to be reliable should be admissible even though the plea is subsequently withdrawn. This is particularly true in those cases where, if the House rule were in effect, a defendant would be able to contradict his previous statements and thereby lie with impunity [See *Harris v. New York,* 401 U.S. 222 (1971) ]. To prevent such an injustice, the rule has been modified to permit the use of such statements for the limited purposes of impeachment and in subsequent perjury or false statement prosecutions. Senate Report No. 93-1277.

The House bill provides that evidence of a guilty or nolo contendere plea, of an offer of either plea, or of statements made in connection with such pleas or offers of such pleas, is inadmissible in any civil or criminal action, case or proceeding against the person making such plea or offer. The Senate amendment makes the rule inapplicable to a voluntary and reliable statement made in court on the record where the statement is offered in a subsequent prosecution of the declarant for perjury or false statement.

The issues raised by Rule 410 are also raised by proposed Rule 11(e)(6) of the Federal Rules of Criminal Procedure presently pending before Congress. This proposed rule, which deals with the admissibility of pleas of guilty or nolo contendere, offers to make such pleas, and statements made in connection with such pleas, was promulgated by the Supreme Court on April 22, 1974, and in the absence of congressional action will become effective on August 1, 1975. The conferees intend to make no change in the presently-existing case law until that date, leaving the courts free to develop rules in this area on a case-by-case basis.

The Conferees further determined that the issues presented by the use of guilty and nolo contendere pleas, offers of such pleas, and statements made in connection with such pleas or offers, can be explored in greater detail during Congressional consideration of Rule 11(e)(6) of the Federal Rules of Criminal Procedure. The Conferees believe, therefore, that it is best to defer its effective date until August 1, 1975. The Conferees intend that Rule 410 would be superseded by any subsequent Federal Rule of Criminal Procedure or act of Congress with which it is inconsistent, if the Federal Rule of Criminal Procedure or Act of Congress takes effect or becomes law after the date of the enactment of the act establishing the rules of evidence.

The conference adopts the Senate amendment with an amendment that expresses the above intentions. House Report No. 93-1597.

**1979 Amendments**

Present rule 410 conforms to rule 11(e)(6) of the Federal Rules of Criminal Procedure. A proposed amendment to rule 11(e) (6) would clarify the circumstances in which pleas, plea discussions and related statements are inadmissible in evidence: see Advisory Committee Note thereto. The amendment proposed above would make comparable changes in rule 410.

**2011 Amendments**

The language of Rule 410 has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility.

Notes of Decisions (153)

Fed. Rules Evid. Rule 410, 28 U.S.C.A., FRE Rule 410
Including Amendments Received Through 10-1-2025

United States Code Annotated
Federal Rules of Evidence (Refs & Annos)
Article XI. Miscellaneous Rules

Federal Rules of Evidence Rule 1101, 28 U.S.C.A.

Rule 1101. Applicability of the Rules

Currentness

**(a) To Courts and Judges.** These rules apply to proceedings before:

- United States district courts;

- United States bankruptcy and magistrate judges;

- United States courts of appeals;

- the United States Court of Federal Claims; and

- the district courts of Guam, the Virgin Islands, and the Northern Mariana Islands.

**(b) To Cases and Proceedings.** These rules apply in:

- civil cases and proceedings, including bankruptcy, admiralty, and maritime cases;

- criminal cases and proceedings; and

- contempt proceedings, except those in which the court may act summarily.

**(c) Rules on Privilege.** The rules on privilege apply to all stages of a case or proceeding.

**(d) Exceptions.** These rules--except for those on privilege--do not apply to the following:

**(1)** the court's determination, under Rule 104(a), on a preliminary question of fact governing admissibility;

**(2)** grand-jury proceedings; and

**(3)** miscellaneous proceedings such as:

- extradition or rendition;

- issuing an arrest warrant, criminal summons, or search warrant;

• a preliminary examination in a criminal case;

• sentencing;

• granting or revoking probation or supervised release; and

• considering whether to release on bail or otherwise.

**(e) Other Statutes and Rules.** A federal statute or a rule prescribed by the Supreme Court may provide for admitting or excluding evidence independently from these rules.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1947; Pub.L. 94-149, § 1(14), Dec. 12, 1975, 89 Stat. 806; Pub.L. 95-598, Title II, §§ 251, 252, Nov. 6, 1978, 92 Stat. 2673; Pub.L. 97-164, Title I, § 142, Apr. 2, 1982, 96 Stat. 45; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 25, 1988, eff. Nov. 1, 1988; Pub.L. 100-690, Title VII, § 7075(c), Nov. 18, 1988, 102 Stat. 4405; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 26, 2011, eff. Dec. 1, 2011.)

**ADVISORY COMMITTEE NOTES**
**1972 Proposed Rules**

**Note to Subdivision (a).** The various enabling acts contain differences in phraseology in their descriptions of the courts over which the Supreme Court's power to make rules of practice and procedure extends. The act concerning civil actions, as amended in 1966, refers to "the district courts * * * of the United States in civil actions, including admiralty and maritime cases. * * *" 28 U.S.C. § 2072, Pub.L. 89-773, § 1, 80 Stat. 1323. The bankruptcy authorization is for rules of practice and procedure "under the Bankruptcy Act." 28 U.S.C. § 2075, Pub.L. 88-623, § 1, 78 Stat. 1001. The Bankruptcy Act in turn creates bankruptcy courts of "the United States district courts and the district courts of the Territories and possessions to which this title is or may hereafter be applicable." 11 U.S.C. §§ 1(10), 11(a). The provision as to criminal rules up to and including verdicts applies to "criminal cases and proceedings to punish for criminal contempt of court in the United States district courts, in the district courts for the districts of the Canal Zone and Virgin Islands, in the Supreme Court of Puerto Rico, and in proceedings before United States magistrates." 18 U.S.C. § 3771.

These various provisions do not in terms describe the same courts. In congressional usage the phrase "district courts of the United States," without further qualification, traditionally has included the district courts established by Congress in the states under Article III of the Constitution, which are "constitutional" courts, and has not included the territorial courts created under Article IV, Section 3, clause 2, which are "legislative" courts. *Hornbuckle v. Toombs,* 85 U.S. 648, 21 L.Ed. 966 (1873). However, any doubt as to the inclusion of the District Court for the District of Columbia in the phrase is laid at rest by the provisions of the Judicial Code constituting the judicial districts, 28 U.S.C. § 81 et seq., creating district courts therein, id. § 132, and specifically providing that the term "district court of the United States" means the court so constituted. *Id.* § 451. The District of Columbia is included. *Id.* § 88. Moreover, when these provisions were enacted, reference to the District of Columbia was deleted from the original civil rules enabling act. 28 U.S.C. § 2072. Likewise Puerto Rico is made a district, with a district court, and included in the term. *Id.* § 119. The question is simply one of the extent of the authority conferred by Congress. With respect to civil rules it seems clearly to include the district courts in the states, the District Court for the District of Columbia, and the District Court for the District of Puerto Rico.

The bankruptcy coverage is broader. The bankruptcy courts include "the United States district courts," which includes those enumerated above. Bankruptcy courts also include "the district courts of the Territories and possessions to which this title is or

may hereafter be applicable." 11 U.S.C. §§ 1(10), 11(a). These courts include the district courts of Guam and the Virgin Islands. 48 U.S.C. §§ 1424(b), 1615. Professor Moore points out that whether the District Court for the District of the Canal Zone is a court of bankruptcy "is not free from doubt in view of the fact that no other statute expressly or inferentially provides for the applicability of the Bankruptcy Act in the Zone." He further observes that while there seems to be little doubt that the Zone is a territory or possession within the meaning of the Bankruptcy Act, 11 U.S.C. § 1(10), it must be noted that the appendix to the Canal Zone Code of 1934 did not list the Act among the laws of the United States applicable to the Zone. 1 Moore's Collier on Bankruptcy ¶ 1.10, pp. 67, 72, n. 25 (14th ed. 1967). The Code of 1962 confers on the district court jurisdiction of:

**"(4)** actions and proceedings involving laws of the United States applicable to the Canal Zone; and

**"(5)** other matters and proceedings wherein jurisdiction is conferred by this Code or any other law." Canal Zone Code, 1962, Title 3, § 141.

Admiralty jurisdiction is expressly conferred. *Id.* § 142. General powers are conferred on the district court, "if the course of proceeding is not specifically prescribed by this Code, by the statute, or by applicable rule of the Supreme Court of the United States * * *" *Id.* § 279. Neither these provisions nor § 1(10) of the Bankruptcy Act ("district courts of the Territories and possessions to which this title is or may hereafter be applicable") furnishes a satisfactory answer as to the status of the District Court for the District of the Canal Zone as a court of bankruptcy. However, the fact is that this court exercises no bankruptcy jurisdiction in practice.

The criminal rules enabling act specified United States district courts, district courts for the districts of the Canal Zone and the Virgin Islands, the Supreme Court of the Commonwealth of Puerto Rico, and proceedings before United States commissioners. Aside from the addition of commissioners, now magistrates, this scheme differs from the bankruptcy pattern in that it makes no mention of the District Court of Guam but by specific mention removes the Canal Zone from the doubtful list.

The further difference in including the Supreme Court of the Commonwealth of Puerto Rico seems not to be significant for present purposes, since the Supreme Court of the Commonwealth of Puerto Rico is an appellate court. The Rules of Criminal Procedure have not been made applicable to it, as being unneeded and inappropriate, Rule 54(a) of the Federal Rules of Criminal Procedure, and the same approach is indicated with respect to rules of evidence.

If one were to stop at this point and frame a rule governing the applicability of the proposed rules of evidence in terms of the authority conferred by the three enabling acts, an irregular pattern would emerge as follows:

**Civil actions,** including admiralty and maritime cases--district courts in the states, District of Columbia, and Puerto Rico.

**Bankruptcy**--same as civil actions, plus Guam and Virgin Islands.

**Criminal cases**--same as civil actions, plus Canal Zone and Virgin Islands (but not Guam).

This irregular pattern need not, however, be accepted. Originally the Advisory Committee on the Rules of Civil Procedure took the position that, although the phrase "district courts of the United States" did not include territorial courts, provisions in the organic laws of Puerto Rico and Hawaii would make the rules applicable to the district courts thereof, though this would not be so as to Alaska, the Virgin Islands, or the Canal Zone, whose organic acts contained no corresponding provisions. At the suggestion of the Court, however, the Advisory Committee struck from its notes a statement to the above effect. 2 Moore's Federal Practice ¶ 1.07 (2nd ed. 1967); 1 Barron and Holtzoff, Federal Practice and Procedure § 121 (Wright ed. 1960). Congress thereafter by various enactments provided that the rules and future amendments thereto should apply to the district courts of Hawaii, 53 Stat. 841 (1939), Puerto Rico, 54 Stat. 22 (1940), Alaska, 63 Stat. 445 (1949), Guam, 64 Stat. 384-390 (1950), and the Virgin Islands, 68 Stat. 497, 507 (1954). The original enabling act for rules of criminal procedure specifically mentioned the district courts of the Canal Zone and the Virgin Islands. The Commonwealth of Puerto Rico was blanketed in by creating its

court a "district court of the United States" as previously described. Although Guam is not mentioned in either the enabling act or in the expanded definition of "district court of the United States," the Supreme Court in 1956 amended Rule 54(a) to state that the Rules of Criminal Procedure are applicable in Guam. The Court took this step following the enactment of legislation by Congress in 1950 that rules theretofore or thereafter promulgated by the Court in civil cases, admiralty, criminal cases and bankruptcy should apply to the District Court of Guam, 48 U.S.C. § 1424(b), and two Ninth Circuit decisions upholding the applicability of the Rules of Criminal Procedure to Guam. *Pugh v. United States,* 212 F.2d 761 (9th Cir.1954) *superseded by statute on different grounds as stated in U.S. v. Obak,* 884 F.3d 934, 938 (9th Cir. 2018); *Hatchett v. Guam,* 212 F.2d 767 (9th Cir.1954); Orfield, The Scope of the Federal Rules of Criminal Procedure, 38 U. of Det.L.J. 173, 187 (1960).

From this history, the reasonable conclusion is that Congressional enactment of a provision that rules and future amendments shall apply in the courts of a territory or possession is the equivalent of mention in an enabling act and that a rule on scope and applicability may properly be drafted accordingly. Therefore the pattern set by Rule 54 of the Federal Rules of Criminal Procedure is here followed.

The substitution of magistrates in lieu of commissioners is made in pursuance of the Federal Magistrates Act, P.L. 90-578, approved October 17, 1968, 82 Stat. 1107.

**Note to Subdivision (b).** Subdivision (b) is a combination of the language of the enabling acts, supra, with respect to the kinds of proceedings in which the making of rules is authorized. It is subject to the qualifications expressed in the subdivisions which follow.

**Note to Subdivision (c).** Subdivision (c) singling out the rules of privilege for special treatment, is made necessary by the limited applicability of the remaining rules.

**Note to Subdivision (d).** The rule is not intended as an expression as to when due process or other constitutional provisions may require an evidentiary hearing. Paragraph (1) restates, for convenience, the provisions of the second sentence of Rule 104(a), *supra.* See Advisory Committee's Note to that rule.

(2) While some states have statutory requirements that indictments be based on "legal evidence," and there is some case law to the effect that the rules of evidence apply to grand jury proceedings, 1 Wigmore § 4(5), the Supreme Court has not accepted this view. In *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1965), the Court refused to allow an indictment to be attacked, for either constitutional or policy reasons, on the ground that only hearsay evidence was presented.

"It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change." *Id.* at 364. The rule as drafted does not deal with the evidence required to support an indictment.

(3) The rule exempts preliminary examinations in criminal cases. Authority as to the applicability of the rules of evidence to preliminary examinations has been meagre and conflicting. Goldstein, The State and the Accused: Balance of Advantage in Criminal Procedure, 69 Yale L.J. 1149, 1168, n. 53 (1960); Comment, Preliminary Hearings on Indictable Offenses in Philadelphia, 106 U. of Pa.L.Rev. 589, 592-593 (1958). Hearsay testimony is, however, customarily received in such examinations. Thus in a Dyer Act case, for example, an affidavit may properly be used in a preliminary examination to prove ownership of the stolen vehicle, thus saving the victim of the crime the hardship of having to travel twice to a distant district for the sole purpose of testifying as to ownership. It is believed that the extent of the applicability of the Rules of Evidence to preliminary examinations should be appropriately dealt with by the Federal Rules of Criminal Procedure which regulate those proceedings.

Extradition and rendition proceedings are governed in detail by statute. 18 U.S.C. §§ 3181-3195. They are essentially administrative in character. Traditionally the rules of evidence have not applied. 1 Wigmore § 4(6). Extradition proceedings are accepted from the operation of the Rules of Criminal Procedure. Rule 54(b)(5) of Federal Rules of Criminal Procedure.

The rules of evidence have not been regarded as applicable to sentencing or probation proceedings, where great reliance is placed upon the presentence investigation and report. Rule 32(c) of the Federal Rules of Criminal Procedure requires a presentence investigation and report in every case unless the court otherwise directs. In *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), in which the judge overruled a jury recommendation of life imprisonment and imposed a death sentence, the Court said that due process does not require confrontation or cross-examination in sentencing or passing on probation, and that the judge has broad discretion as to the sources and types of information relied upon. Compare the recommendation that the substance of all derogatory information is disclosed to the defendant, in A.B.A. Project on Minimum Standards for Criminal Justice, Sentencing Alternatives and Procedures § 4.4, Tentative Draft (1967, Sobeloff, Chm.). Williams was adhered to in *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), but not extended to a proceeding under the Colorado Sex Offenders Act, which was said to be a new charge leading in effect to punishment, more like the recidivist statutes where opportunity must be given to be heard on the habitual criminal issue.

Warrants for arrest, criminal summonses, and search warrants are issued upon complaint or affidavit showing probable cause. Rules 4(a) and 41(c) of the Federal Rules of Criminal Procedure. The nature of the proceedings makes application of the formal rules of evidence inappropriate and impracticable.

Criminal contempts are punishable summarily if the judge certifies that he saw or heard the contempt and that it was committed in the presence of the court. Rule 42(a) of the Federal Rules of Criminal Procedure. The circumstances which preclude application of the rules of evidence in this situation are not present, however, in other cases of criminal contempt.

Proceedings with respect to release on bail or otherwise do not call for application of the rules of evidence. The governing statute specifically provides:

"Information stated in, or offered in connection with, any order entered pursuant to this section need not conform to the rules pertaining to the admissibility of evidence in a court of law." 18 U.S.C.A. § 3146(f). This provision is consistent with the type of inquiry contemplated in A.B.A. Project on Minimum Standards for Criminal Justice, Standards Relating to Pretrial Release, § 4.5(b), (c), p. 16 (1968). The references to the weight of the evidence against the accused, in Rule 46(a)(1), (c) of the Federal Rules of Criminal Procedure and in 18 U.S.C.A. § 3146(b), as a factor to be considered, clearly do not have in view evidence introduced at a hearing.

The rule does not exempt habeas corpus proceedings. The Supreme Court held in *Walker v. Johnston,* 312 U.S. 275, 61 S.Ct. 574, 85 L.Ed. 830 (1941), that the practice of disposing of matters of fact on affidavit, which prevailed in some circuits, did not "satisfy the command of the statute that the judge shall proceed 'to determine the facts of the case, by hearing the testimony and arguments.' " This view accords with the emphasis in *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), upon trial-type proceedings, *id.* 311, 83 S.Ct. 745, with demeanor evidence as a significant factor, *id.* 322, 83 S.Ct. 745, in applications by state prisoners aggrieved by unconstitutional detentions. Hence subdivision (3) applies the rules to habeas corpus proceedings to the extent not inconsistent with the statute.

**Note to Subdivision (e).** In a substantial number of special proceedings, *ad hoc* evaluation has resulted in the promulgation of particularized evidentiary provisions, by Act of Congress or by rule adopted by the Supreme Court. Well adapted to the particular proceedings, though not apt candidates for inclusion in a set of general rules, they are left undisturbed. Otherwise, however, the rules of evidence are applicable to the proceedings enumerated in the subdivision.

**1974 Enactment**

**Note to Subdivision (a).** Subdivision (a) as submitted to the Congress, in stating the courts and judges to which the Rules of Evidence apply, omitted the Court of Claims and commissioners of that Court. At the request of the Court of Claims, the Committee amended the Rule to include the Court and its commissioners within the purview of the Rules.

**Note to Subdivision (b).** Subdivision (b) was amended merely to substitute positive law citations for those which were not. House Report No. 93-650.

### 1987 Amendments

Subdivision (a) is amended to delete the reference to the District Court for the District of the Canal Zone, which no longer exists, and to add the District Court for the Northern Mariana Islands. The United States bankruptcy judges are added to conform the subdivision with Rule 1101(b) and Bankruptcy Rule 9017.

### 1988 Amendments

The amendments are technical. No substantive change is intended.

### 1993 Amendments

This revision is made to conform the rule to changes in terminology made by Rule 58 of the Federal Rules of Criminal Procedure and to the changes in the title of United States magistrates made by the Judicial Improvements Act of 1990.

### 2011 Amendments

The language of Rule 1101 has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility.

Notes of Decisions (125)

Fed. Rules Evid. Rule 1101, 28 U.S.C.A., FRE Rule 1101
Including Amendments Received Through 10-1-2025

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---